**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**DOUGLAS AND LOMASON COMPANY, Respondent.**

**No. 17533.**

United States Court of Appeals Eighth Circuit.

June 26, 1964.

---

30. Fay v. Noia, 1963, 372 U.S. 391, 472, 83 S.Ct. 822, 9 L.Ed.2d 837 (dissenting opinion).

31. Ibid.

Morton Namrow, Atty., N. L. R. B., Washington, D. C., made argument for petitioner. Arnold Ordman, Gen. Counsel, N. L. R. B., Dominick L. Manoli, Associate Gen. Counsel, N. L. R. B., Marcel Mallet-Prevost, Asst. Gen. Counsel, N. L. R. B., Elliott Moore and Paul Resnik, Attys., N. L. R. B., Washington, D. C., were on the brief.

Frank M. Swift, of Smith, Swift, Currie, McGhee, & Hancock, Atlanta, Ga., made argument for respondent and Donald D. Smith, of Smith, Swift, Currie, McGhee & Hancock, Atlanta, Ga., was with him on the brief.

Before VOGEL, MATTHES and RIDGE, Circuit Judges.

RIDGE, Circuit Judge.

Petitioner seeks enforcement of its order finding respondent violated Section 8(a) (1) of the National Labor Relations Act, 29 U.S.C.A. § 158(a) (1) (hereinafter referred to as the Act), by granting a wage increase to its employees to discourage union activities. The sole issue before us is whether there is substantial evidence in the record to sus-

tain such finding and order of the National Labor Relations Board.[1]

Respondent is a Michigan corporation, with plants located in Detroit, Michigan, Newman and Carrollton, Georgia, and Marianna, Arkansas, the plant involved in this proceeding. The corporation is engaged in the production of automobile parts. In October 1960, the union began an organizational campaign at respondent's Arkansas plant which culminated in an election on May 4, 1961, which the union lost. Thereafter, in the early months of 1962, interest in the union was revived. On April 30, 1962, a meeting of some employees of respondent and a union representative was held at the Arkansas plant to renew the organizational campaign. Subsequent thereto and during the week of May 14, 1962, respondent's Arkansas plant manager, Ronald Boccarossa, attended a staff meeting in Detroit with respondent's President. According to the testimony of Boccarossa, the tool program of respondent for the coming year was discussed; so, too, were problems covering labor relations and the Company's insurance program. At that time, Boccarossa recommended a wage increase for employees at the Arkansas plant. He was the only plant manager attending the meeting who recommended an increase for any of respondent's employees. Upon his return to the Arkansas plant, Boccarossa, on May 18, assembled the employees to inform them of the wage increase. There is conflicting evidence in the record as to precisely what Boccarossa said at that time. One of the plant's employees, Osburn Treat, whose testimony was credited by the Trial Examiner, testified that Boccarossa began by "telling us about the way he felt about a union." According to Treat, Boccarossa spoke of the Company's labor relations with a union at the Company's Detroit plant, pointing out that the union made excessive demands which resulted in a reduction of the working force there from 1700 to about 200 employees; that Boccarossa also spoke of the Company's efforts to get a swimming pool for the employees and their families at the Arkansas plant which, he said, "if * * * built there would be 97 percent of the employees and their families that would be welcome, but the other three percent he didn't care whether they came or not * * *." It was thereafter that Boccarossa announced the pay raise effective the first of June, and added the employees "would get the dime raise without the union." Three days later, on May 21, 1962, the union[2] filed its petition for an election with the Board and notified respondent of the names of its employees on its organizational committee which, presumably, included the name of one J. V. Sitzes. The election was held on June 14, 1962, and again the union lost. The Board by its order determined that the wage increase announced on May 18, 1962, violated Section 8(a) (1) of the Act, in that it influenced respondent's plant's employees to vote against the union at the second election.

On brief before us, respondent concedes: "The record here shows Boccarossa (did talk) about unions in his speech and made comments reasonably calculated to disparage unionism in general" and that "(w)hile such evidence could properly be considered on the question of whether Boccarossa was aware of Union activity when he announced the wage increase," it is respondent's singular contention that "such evidence does not support a finding that he (Boccarossa) was aware of Union activity (in its Arkansas plant) at the time the *decision to grant* the wage increase was made in Detroit." (Par. and emp. added.)

▮ In the light of the foregoing, we think it is readily perceptible that there is no contest here concerning the now well-established rule that any grant of benefits having as its object the induce-

1. The Board's decision and order are reported in 142 NLRB, No. 36.

2. International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, A.F.L.-C.I.O.

ment of employees to reject a union violates Section 8(a) (1) of the Act. N. L. R. B. v. Exchange Parts Co., 375 U.S. 405, 84 S.Ct. 457, 11 L.Ed.2d 435, and that all which appears to be involved in this case can be related to "timing". That is to say, it is respondent's singular contention before us that there is no substantial evidence in this record to support a finding by the Board that respondent was aware of any union organizational activities existing at its Arkansas plant, prior to the time the decision was reached in Detroit, to grant a wage increase to the employees at that plant, effective as of June 1, 1962; and, absent any specific showing of prior knowledge on respondent's part, enforcement of the Board's order as here prayed should be denied.

In support of the above contention, respondent argues that "it is improper for the Board" in a case such as this, "to impute knowledge" to it of union organizational activities, "solely on the basis" that on one date Boccarossa, its Arkansas plant manager, "made anti-union statements," and "on a later date" a salary increase was granted; when it appears that its plant manager only had "an opportunity to learn of the union activity" at its Arkansas plant "after the decision to raise wages" was made.

We do not believe that the issues in the case at bar are so limited:

▮▮▮▮ First, because the issue of knowledge as here raised is clearly one of fact, resolution of which was wholly within the competence of the National Labor Relations Board. "The rule in this Circuit is that 'the question of credibility of witnesses and the weight to be given to their testimony' in labor cases is primarily one for determination by the trier of facts." N.L.R.B. v. Morrison Cafeteria Co., 311 F.2d 534, 538 (8 Cir. 1963). This Court will only set aside decisions of the N.L.R.B. when we "cannot conscientiously find that the evidence supporting (the) decision is substantial, when viewed in the light (of) the record in its entirety * * *, including the body of evidence opposed to the Board's view." 311 F.2d at 536; quoting Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456.

Secondly, here it appears that for some time prior to the second union organizational election held at respondent's Arkansas plant—management and supervising personnel of that plant were keenly aware that some of its employees in that plant were union-conscious. As a consequence thereof, it is established that some of respondent's supervisory personnel "had bent over backwards" and shown at least one employee (J. V. Sitzes) who had been most active in union organizational processes in the Arkansas plant, "more consideration than any man in the plant simply because he was a union man" before his final discharge from employment because of inefficient work conduct, several months after the second election was held.[3] Additionally, it is not without significance in the case at bar, that Boccarossa was respondent's only plant manager to ask for authorization for a wage increase at the Detroit meeting, and his plant was the only one that received such increase effective June 1, 1962. Though there is no direct evidence pointing to the extent of knowledge on the part of Boccarossa of the renewed organizational

3. The suspension and discharge of J. V. Sitzes was an "unfair labor practice" charged against respondent, which was heard and determined by the Trial Examiner at the time hearing was held on respondent's alleged 8(a) (1) violation. On conflicting testimony as to the cause and grounds for the discharge of Sitzes, the Trial Examiner found the issues in favor of respondent and ruled that its discharge of Sitzes was not in violation of Section 8(a) (3) of the Act. The Board sustained both such findings and conclusions of the Trial Examiner. Though the latter matter is not before us, the Trial Examiner's report, as a whole, does appear in the record and affords enlightenment on the important issue of "knowledge", presented in relation to respondent's 8(a) (1) violation.

activities of the union in 1962, we think that the Board could properly conclude from the record as a whole that he did have such knowledge; otherwise, he would not have made such extensive references to the union problems in respondent's Detroit plant, and to the Arkansas plant's beneficial working conditions and wage policy, which the Trial Examiner found he made in his speech. Furthermore, as stated by the Trial Examiner in his intermediate report (adopted by the Board):

> "Significantly the wage increase of June 1 could hardly have been announced at a more strategic time coming as it did so soon after the first union organizing meeting of employees. * * * Finally Treat's credited testimony concerning Boccarossa's antiunion speech demonstrates Respondent's purpose in promising and granting the wage increase was to convince the employees they did not need a union in order to get wage increases, thereby deterring their union activities."

That the announcement of this wage increase did interfere with the results of the election subsequently held, cannot be gainsaid.

■ There is no merit to respondent's contention that such wage increase was a part of a general wage plan and one which was granted independently of union activity. Review of the record as a whole reveals that respondent did not have any established wage policy, providing for any increases in pay for employees at its Arkansas plant, at the time here considered. In the absence of any such policy, and in the light of the manner in which this wage increase was granted and announced, we think the Board could reasonably have concluded, as it did, that respondent here granted the same with intent to interfere with the right of its employees to self-organization. Cf. Indiana Metal Products Corp. v. N.L.R.B., 202 F.2d 613, 620 (7 Cir. 1953).

■ True, as respondent asserts, Section 8(a) (1) of the Act, supra, does not preclude employers from introducing benefits to employees during an organizational period. But we add, when as here it appears that management has used the grant of a wage increase as an allurement for employees not to join a union, such conduct can bear no shield of privilege solely from the standpoint of "timing" * * * as respondent contends. The interference with union organizational activities here considered appears to be one likely to continue *in futuro*. Any such interferences, accomplished by allurements, are as much condemned by the Act as is coercion. Cf. Joy Silk Mills v. N.L.R.B. (1950), 87 U.S.App.D.C. 360, 185 F.2d 732, cert. den. 341 U.S. 914, 71 S.Ct. 734, 95 L. Ed. 1350. As Mr. Justice Harlan recently said, in N.L.R.B. v. Exchange Parts Co., supra, Section 8(a) (1) of the Act does more than prohibit "intrusive threats and promises." It is also designed to curb:

> "* * * conduct immediately favorable to employees which is undertaken with the express purpose of impinging upon their freedom of choice for or against unionization and is reasonably calculated to have that effect. * * * The danger inherent in well-timed increases in benefits is the suggestion of a fist inside the velvet glove. Employees are not likely to miss the inference that the source of benefits now conferred is also the source from which future benefits must flow and which may dry up if it is not obliged."

See also, Beaver Valley Canning Co. v. N.L.R.B., 332 F.2d 429 (8 Cir., May 1964); N.L.R.B. v. Hoffman-Taff, Inc., 276 F.2d 193 (8 Cir. 1960); N.L.R.B. v. Crown Can Co., 138 F.2d 263 (8 Cir. 1943).

The petition to enforce the Board's order is granted.