### NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

### RITCHIE MANUFACTURING COMPANY, Respondent.

### No. 17978.

United States Court of Appeals
Eighth Circuit.

Dec. 14, 1965.

As Corrected on Denial of Rehearing
Jan. 11, 1966.

Gary Green, Attorney, N. L. R. B., Washington, D. C., Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, and Marcel Mallet-Prevost, Asst. General Counsel, on the brief, for petitioner.

Rex J. Ryden, of Cartwright, Druker, Ryden & Fagg, Marshalltown, Iowa, H. G. Cartwright, of Cartwright, Druker, Ryden & Fagg, Marshalltown, Iowa, for respondent.

Before VOGEL, Chief Judge, and VAN OOSTERHOUT and MEHAFFY, Circuit Judges.

VOGEL, Chief Judge.

The National Labor Relations Board (hereafter Board) seeks enforcement of an order issued on June 30, 1964, pursuant to § 10(e) of the National Labor Relations Act (hereafter Act), 29 U.S.C.A. § 151 et seq. The Board's decision and order are reported at 147 N.L.R.B. No. 123. The Board, adopting the Examiner's findings, conclusions and recommendations, held that the respondent, Ritchie Manufacturing Company, of Conrad, Iowa, a manufacturer of barnyard watering devices, was in violation of § 8(a) (1) (3) and (4) of the Act [1] in dealing with one Robert E. Feltz, a one-time employee of respondent, and in other matters. Respondent was ordered to cease and desist from the alleged unfair labor practices, to reinstate Feltz with back pay and interest and to post appropriate notices.

Feltz, an ordained Baptist minister, was initially employed by respondent on October 15, 1962. At that time Feltz was interviewed by respondent's vice president, Mr. C. D. Wilson, Jr. Wilson, Jr., told Feltz that an employee must work one year before being given any guarantee of permanent employment. In further regard to this interview, Feltz testified as follows:

"I don't recall just how Mr. Wilson happened to bring it up, but he did bring up the matter that there was going to be a union election. And I stated that I was for the principle of organized labor but there were things that I objected to in the labor union movement. And I stated that 8½ years before that I worked in a factory in Michigan in between churches, and a union election came up at that time and I voted 'No.'"

As a new employee Feltz was not eligible to vote in the election referred to, which subsequently took place on November 6, 1962.

The election was conducted by the Board to determine if the International Molders and Allied Workers Union, AFL-CIO (hereafter union) would represent respondent's staff of some 60 employees. Union lost the election. Prior to the election respondent, primarily through Wilson, Jr., had threatened to fire anyone contemplating joining the union, to close down if the union won the election, or to take certain other drastic actions.

In February and March of 1963 respondent terminated the employment of three employees who had been "trying to get a union in here". On March 29, 1963, union filed unfair labor practice charges in case No. 18-CA-1603 against respondent as a result of the terminations. A complaint was issued in that case by the General Counsel of the Board on May 21, 1963, and a hearing was set for July 16, 1963. Case No. 18-CA-1603 was ultimately settled on July 24, 1963,

---

1. Under 29 U.S.C.A. § 158, insofar as pertinent herein:

    "(a) It shall be an unfair labor practice for an employer—

    "(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title [dealing with the employees' rights to self-organization and collective bargaining];

       *   *   *   *   *

    "(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: * * *

    "(4) to discharge or otherwise discriminate against an employee because he has filed charges or given testimony under this subchapter; * * *".

when respondent paid the three discharged employees a stipulated sum of back pay and posted notices. There were settlement stipulations that respondent did not admit violations of the Act and that "contingent upon compliance with [the settlement's] terms," "no further action shall be taken in the above cause".

In preparation for the July 16th hearing, a representative of the General Counsel met with several employees of respondent, including Feltz, who had been subpoenaed as witnesses by the Board. This meeting took place during the evening of July 9, 1963, at the Redwood Motel in Marshalltown, Iowa. According to the testimony of some of respondent's employees, respondent was aware of the meeting and had it under surveillance. None of respondent's officers took the stand to deny this.[2]

The uncontradicted testimony of Feltz indicated that on the morning of July 10, 1963, he was approached by Mr. C. D. Wilson, Sr., president of respondent. The following conversation took place:

" * * * C. D. Wilson, Sr., came over to me where I was working and said, 'I understand that you attended a union meeting last night'. And I told him that it was much more than a union meeting. He

then asked me how many fellows were there, and I said 'Some.' And he said, 'Well, we don't need a union at the plant.' And then he said something about 'I believe in God' and turned away, and I didn't hear the rest that he said."

Irvin Steinberg, another employee of respondent who had also attended the July 9th meeting at the Redwood Motel, testified that he had been approached by Dick Sweet, a foreman[3] in respondent's plant, near the end of July 1963. According to Steinberg, Sweet allegedly "asked me if I thought Bob [Feltz] was trying to get the union started; and I told him, 'He hasn't said anything to me about it.' And that is all that was said."

▆ Feltz started at a $1.41 hourly wage rate and after receiving a series of automatic raises he was earning $1.74 per hour as of August 2, 1963. From October 15, 1962, to March 25, 1963, Feltz performed general shop work. On March 25th Dick Sweet directed Feltz to do dip painting and to wash steel parts in a wash rack. The washing is done with a commercial fluid, "Apco", which apparently gives off evaporating fumes that "are disagreeable to some employees and make others dizzy, with a sensation of a

---

2. The only management representative of respondent who testified in the proceedings herein was Leland Wiseman, supervisor of manufacturing at Ritchie. Mr. Wiseman was called by the General Counsel of the Board.

3. As correctly noted by the Trial Examiner:

"There is no genuine question about Sweet's status as foreman or of his supervisory status. The record is replete with undenied testimony by the various employees that Sweet directed their work, passed on their requests for time off, assigned them their different duties, otherwise acted as one in responsible authority over them, and was referred to and regarded by the employees as foreman. Respondent too referred to him that way. Feltz testified that when he reported for work on October 15, Vice President Wilson said he would have Leland Wiseman, the

superintendent, 'take [him] out and introduce [him] to the foreman'; that Wiseman then came in and too said he would 'introduce [him] to the foreman, who would asssign [him] to [his] work,' whereupon he introduced Feltz to Sweet, who in fact, did assign him to his various tasks. Wiseman, examined by the General Counsel under Rule 43(b) denied he used the word 'foreman' * * * He admitted that Sweet sets up the work for the department, trains new employees, assigns them to their work, and passes upon leave requests for short periods. Various events relating to the merits show higher management dealt with Sweet and Sweet dealt with the employees on the premise of his being foreman of the steel shop. * * * The conclusion is that Sweet is a supervisor within the meaning of Section 2(11) of the Act." (Brackets by the Trial Examiner.)

'cheap drunk' ". At the end of a week Feltz, experiencing nausea, headaches, dizziness and aching lungs which apparently resulted from the evaporating fumes, reported to respondent's plant superintendent, Leland Wiseman, that he would have to quit if he had to continue working at the wash rack. Wiseman informed Feltz that he had "a very poor work record" and was not holding up his end of production. After a conference with Wilson, Jr., Wiseman gave Feltz a two-week trial at shop work doing spot welding.[4] Wiseman discouraged Feltz from quitting because of respondent's policy to do everything possible to allow an employee to work out. Feltz testified that approximately one month after starting the spot welding he was asked by Wiseman if he liked the work. He replied he did, to which Wiseman, who, it should be emphasized, was the plant superintendent, allegedly responded, "Well, that solves our problem for us."

Beginning on July 3, 1963, Feltz worked with employee Charles Baker for two and one-half days on a two-man operation to spot weld larger casings. After that, Feltz again worked on general spot welding by himself until he was reassigned to work with Baker on July 18, 1963, to spot weld large No. 5 casings. After three days Baker, who didn't particularly care for spot welding and who also thought Feltz to be a "slow worker", asked to be transferred and he was taken off spot welding after working through July 23rd. On July 24, 1963, the date of the settlement in Case No. 18-CA-1603, Baker was replaced with Dale Weston, a teenager who was unfamiliar with spot welding and who was taught that operation by Feltz. Production records, which were never produced as such, were kept after Baker was replaced and indicated that the Feltz-Weston team produced 31, 36, 36, 41 (4 of them "bad") and 36 casings for the five working days beginning on July 24, 1963. Feltz's testimony indicated these figures may have been low by four or five casings per day. Another team, who were experienced spot welders and did nothing else, produced some 54 casings per day during the same period. The records were kept, according to Wiseman, to help locate a bottleneck in production. On July 31, 1963, the Feltz-Weston team was replaced with another team "because they weren't producing enough casings". The team replacing the Feltz-Weston team supposedly produced 51 casings their first day, but significantly no further records were kept after July 31, 1963. There was testimony that it took at least a week before a new team could expect to produce in excess of 50 No. 5 casings per day.

Feltz worked on the "big shears" until 11 a. m. of August 1, 1963, at which time he was reassigned to the wash rack. Wiseman testified that one of the reasons he reassigned Feltz to the wash rack was because Feltz's physical structure would not permit him to perform effectively, e. g., on the "breaking operation". Feltz stood 5 feet 6 inches tall and weighed 180 pounds. However, another employee, Robert Ellison, testified that he worked on the "breaking operation" even though at 6 feet 1 inch and 275 pounds he "dwarfed" Feltz. Wiseman further testified that the assignment and transfer of men from one job to another within the plant was in line with respondent's general policy.

Feltz testified that on the afternoon of August 1, 1963, he complained to Wiseman about being ill from the wash rack fumes. Wiseman denied this conversation. Feltz managed to finish out that day. On August 2, 1963, Feltz told Wiseman that he wasn't going to work at the

<hr />

4. Wiseman claimed he set no time limit but here, as with other conflicting testimony, Wiseman's testimony was discredited by the Trial Examiner. The Trial Examiner found as a matter of credibility that Wiseman's testimony was evasive and improbable in many instances.

Adverse decisions on matters of credibility form no basis for attacking the Board's findings. Marshfield Steel Co. v. N. L. R. B., 8 Cir., 1963, 324 F.2d 333, 336; N. L. R. B. v. Morrison Cafeteria Co. of Little Rock, Inc., 8 Cir., 1963, 311 F.2d 534, 538.

wash rack any longer. Feltz further testified as follows:

"And at about 9:15 Leland Wiseman came by, and I called him over to where I was working. And I told him that, because I had gotten sick from the fumes again, I wasn't going to work at the wash rack after 9:30. And I told him that it was because I was sick that I wanted to go home for the rest of the day. And I asked for my paycheck.

"And we talked further, and I asked him why it was that I was put back on that work when I had gotten sick from the fumes back in March. And he told me that that was the only work that was left for me to do. And I asked him then why I was taken off of spot welding, and he told me that it was because I was too slow a worker; that I had a very poor work record and I wasn't holding up my end of production.

"And then he told me that it cost the company a lot to train a man, and that when the man didn't progress and catch on that that expense was a loss to the company. And I asked him if that was true of me, and he said 'Yes.'

"And then I told him that I felt that he was expecting too much of Chuck [Baker] and me and then Dale [Weston] and me on the spot welding of the casings by comparing us with the work of Jerry and Howard [the experienced spot welders].

"And then I told him again that, or, rather, I asked him again for my check; that I wanted to go home for the rest of the day because I was sick. And then he left me and was gone a while and then came back with two checks and handed them to me. And I was surprised at receiving two. And I asked him if the receiving of the two checks meant that I was through, and he said 'Yes,'—

"Q. Excuse me. Well, finish your statement there.

"A. And he said 'Yes,' because I had said I was through.

\* \* \* \* \* \*

"Q. Go ahead. Finish the conversation you had then with Mr. Wiseman.

"A. And after he said that I was through because I had said I was through I told him I had never said anything about being through; that all that I had asked for was my check because I had gotten sick from the fumes from the cleaning there and that I wanted to go home for the rest of the day.

"And he insisted again that I had said that I was through. And then three times—I believe three times—he said that. And then I told him I hadn't said anything about being through. And then, to the best of my knowledge, I believe that—I could see that there wasn't going to be anything gained by arguing, and so I pointed my finger at him, and I said, 'You can be sure you are going to hear more about this.' And I turned and took my lunch pail from the shelf and walked out.

"Q. And these paychecks: What period did the paychecks cover?

"A. Well, the one that I would normally have gotten on that Friday in that it was payday, and the second one for that particular week."

Wiseman denied that Feltz ever said he was sick before being paid off. He testified:

"Q. And what did you tell him?

"A. I told him it was his pay up to date. And he wanted to know if he was fired. And I said, 'No.' He asked for his pay and he got it. He asked for his check and he got it.

"Q. And what did he say in response to that?

"A. He talked about the washing job some. I cannot recall just what he did say.

"Q. What did he say about the washing job?

"A. He didn't say anything about it making him sick but that he wasn't going to do it. He refused again to do the job that was assigned to him.

\* \* \* \* \* \*

"Q. Did he describe the effects on him of working on the washing job?

"A. He never gave any indication he was sick until he turned around and walked off.

"Q. Well, I don't know from your answer that he then indicated he was sick.

"A. Yes. After he had the checks and turned around and was walking off he said he was sick and going home.

"Q. And did he ascribe his state of health to anything in particular? Did he tell you why he was sick?

"A. Not to my knowledge or to my recollection, I don't believe he did.

"Q. Well, so far as you know, it could have been any sickness of any kind?

"A. When I walked up to him he was mad.

"Q. When you walked up to him on what occasion?

"A. Previously when he asked me to get his check. And he was just boiling mad, and that left the impression with me, when he said it the way he did, that he wanted his pay and was quitting and was going home.

"Q. That is to say, after you gave him the two checks—

"A. Previous to that. That's the reason that I went and got the checks."

Wiseman maintained Feltz quit wholly on his own accord, while Feltz maintained he was merely leaving for the day and wanted only his regular paycheck due that day. Feltz's time card remained in the rack for some time after August 2, 1963.

In October of 1963, after the complaint was issued in the instant case, respondent, appearing in opposition to Feltz's application for unemployment compensation, stated Feltz was free to return to work. Feltz did so on October 18, 1963. About noon on October 22, 1963, Sweet assigned Feltz to the wash rack. Feltz went home that night feeling ill from the fumes. Feltz testified to the following events of October 23, 1963:

"Q. And did Mr. Sweet talk to you that day? Or tell us what happened when you reported to the wash rack on the 23d.

"A. Well, I went to work at 7 o'clock and by 8:30 I was quite sick from the fumes again. And so I saw where Dick Sweet had walked out toward the back of the plant, and I went and told him that, because I had got sick the day before and now again, I was going to punch out and go over to the doctor and then go home.

"Q. What did Mr. Sweet say?

"A. Nothing.

"Q. What did you do after your conversation with Mr. Sweet?

"A. Well, I just did what I said I was going to do. I went to the time clock and took out my card and punched out and then went over to the doctor's office."

The doctor arranged for Feltz to take a blood test to see if his liver had been damaged by the fumes. Feltz, after taking October 24, 1963, off because of asserted after-effects from the fumes, returned to work on October 25, 1963. Dick Sweet assigned Feltz to the small punch press but at 9:00 a. m. Feltz was ordered to report back to the wash rack. He refused and remained at the press. Later that morning Feltz was summoned to Wiseman's office and, in the presence

of Wilson, Jr., Wiseman, Sweet and others, was given the following notice:

## "WARNING NOTICE
"TO: MR. ROBERT E. FELTZ:

"Because of your complaint on Wednesday, October 23, 1963, of sickness when performing your job on the wash rack you were temporarily placed this morning on a punch press job at 7:00 A.M. At 8:30 A.M., the Company received reports confirming that there was no medical reason why you should not be assigned work at the wash rack. You were directed at 9:00 A.M. to return to the wash rack assignment. You refused to do so. Because of your refusal to perform the job assigned to you, you are subject to discharge from the employ of Ritchie Manufacturing Company.

"This is to notify you that, unless you accept the wash rack work assigned to you not later than 1:00 P.M. today, October 25, 1963, you will be subject to immediate discharge.

RITCHIE MANUFACTURING COMPANY
By /s/ C. D. Wilson, Jr.
C. D. Wilson, Jr.

"Dated October 25, 1963.

Delivered to Robert E. Feltz on October 25, 1963, at 11:15 A.M."

When Feltz refused to report to the wash rack at one o'clock he was informed that he had made his decision and he was paid off.

The Trial Examiner, and subsequently the Board, issued the following conclusions of law:

"1. By discriminating in respect to the hire and tenure of Robert E. Feltz, in order to discourage membership in or activity in support of the Union, Respondent has engaged and is engaged in unfair labor practices within the meaning of Section 8(a) (3) of the Act.

"2. By discriminating in respect to the hire and tenure of Feltz for giving testimony under the Act, Respondent has engaged and is engaging in an unfair labor practice within the meaning of Section 8(a) (4) of the Act.

"3. By the above, and by the acts of surveillance and interrogation heretofore found, Respondent has interfered with, restrained and coerced employees in the exercise of their rights under Section 7, thereby engaging and being engaged in unfair labor practices within the meaning of Section 8(a) (1) of the Act."

Respondent was ordered to cease and desist from discharging or discriminating against employees supporting or desiring membership in the union, from discharging or discriminating against employees giving testimony under the Act or meeting with government officials in anticipation of testifying, from engaging in surveillance of employees' union organization activity or other proceedings sanctioned under the Act, from interrogating employees concerning such activity, and from in any other way interfering with the employees' right to self-organization and collective bargaining. It was further ordered that Feltz be offered full reinstatement with back pay. The order also provided that appropriate notices be posted.

The first alleged error raised by respondent here is that the record as a whole does not support the Board's findings that respondent discharged Feltz in violation of § 8(a) (1) and (3) of the Act. A thorough review of the entire record indicates that the facts as found by the Trial Examiner and adopted by the Board are supported by substantial evidence. The conclusions drawn therefrom, in regard to § 8(a) (1) and (3), were permissible, reasonable and proper. A recent case from this court, Independent Stave Co. v. N. L. R. B., 8 Cir., November 10, 1965, 352 F.2d 553, 558, sets out the oft-stated standard for judicial

review of the findings of fact of the Board:

"* * * Clearly, this court, even if it were otherwise disposed, may not set aside the findings of the Board and deny enforcement of its orders on a difference of opinion basis. We must be mindful of the Congressional admonition in 29 U.S.C.A. § 160(e) that

'* * * The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive * * *'

and of the manner in which that section has been interpreted. See: N. L. R. B. v. Walton Mfg. Co., 1962, 369 U.S. 404, 405, 82 S.Ct. 853, 7 L.Ed.2d 829; Universal Camera Corp. v. N. L. R. B., 1951, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456; N. L. R. B. v. Arkansas-Louisiana Gas Co., 8 Cir., 1964, 333 F.2d 790, 794–795; N. L. R. B. v. Douglas & Lomason Co., 8 Cir., 1964, 333 F.2d 510, 513."

■ Respondent, citing Schwob Mfg. Co. v. N. L. R. B., 5 Cir., 1962, 297 F.2d 864, contends that the Board failed to show Feltz was a union adherent or engaged in union activity. The Schwob court states at page 870 of 297 F.2d that:

"* * * the burden was on General Counsel to prove that management knew that Armstead [the discharged employee therein] was a member of the union and that this knowledge motivated the discharge."

The literal language of Schwob notwithstanding, we feel that it was enough to show that respondent herein thought that Feltz was pro-union and that this was the reason for his discharge. It was the animus and actions of the respondent which were at issue here in determining if there was a discriminatory discharge.

Proof of an unfair labor practice does not require proof of actual union activity or membership by Feltz in the union [5] once it is shown that suspected union activity was what motivated the respondent in discharging Feltz. Beaver Valley Canning Co. v. N. L. R. B., 8 Cir., 1964, 332 F.2d 429, 432. There was clear and substantial evidence, including the observation of Feltz at the Redwood Motel on July 9, 1963, Wilson, Sr.'s conversation with Feltz on July 10, 1963, and the conversation between Steinberg and respondent's foreman Dick Sweet that same month, indicating respondent had strong suspicions of union activity by Feltz, which suspicions, it could reasonably be concluded, led to the unlawful termination of Feltz's employment through systematically placing him for an indefinite period on a job known to cause him illness. From the record it can be inferred that this tactic was employed by respondent to hasten the departure of Feltz as an employee.

■■ Respondent claims that sound business reasons dictated the assigning of Feltz to the wash rack. Respondent asserts that Feltz was qualified for no other job. Without further commentary on this point, it is plain that even if we were to concede respondent's argument, "A justifiable ground for dismissal is no defense if it is a pretext and not the moving cause." N. L. R. B. v. Solo Cup Co., 8 Cir., 1956, 237 F.2d 521, 525. As already indicated, here there is substantial evidence in the record to show that the moving cause of the dismissal of Feltz was his suspected union activity. It is interesting to note that respondent, before it had any reason to know of union activity by Feltz, went out of its way to accommodate him in March of 1963 by moving him from the wash rack to another job, even though he even then allegedly had a poor work record. Only after Feltz attended the July 9, 1963,

5. Besides attending the Marshalltown meeting, the record indicates that Feltz wrote letters to the Board in November of 1962 on an undisclosed subject and in March of 1963 requesting a supply of unfair labor practice charge forms. There is no evidence that respondent knew of these letters, however.

meeting did respondent move Feltz back to the wash rack.

In regard to respondent's assertion that the record does not support a conclusion that it violated § 8(a) (1) of the Act by coercively interrogating employees about their participation in union activities and by subjecting such activities to surveillance, it should be noted, first, that interrogation of employees about union membership may or may not amount to coercion, depending on how the interrogation was conducted and the surrounding circumstances. N. L. R. B. v. Zimnox Coal Co., 6 Cir., 1964, 336 F.2d 516, 517. The mere questioning of Feltz and Steinberg was not the only evidence to be considered in ascertaining if there was a § 8(a) (1) violation. As stated in Bourne v. N. L. R. B., 2 Cir., 1964, 332 F.2d 47, 48:

> " * * * interrogation, not itself threatening, is not held to be an unfair labor practice unless it meets certain fairly severe standards."

See, also, Reserve Supply Corp. of L. I., Inc. v. N. L. R. B., 2 Cir., 1963, 317 F.2d 785, 787; N. L. R. B. v. Protein Blenders, Inc., 8 Cir., 1954, 215 F.2d 749, 750. These standards include, for example, a history of employer hostility and discrimination, the nature of the information sought (e. g., was the interrogator seeking information from which he could take action against individual employees), the identity of the questioner (i. e., what was his position in the company), the place and method of interrogation, and the truthfulness of the reply (e. g., did the interrogation inspire fear leading to evasive answers). In the instant case, as borne out in the record, there is certainly a showing of a history of employer hostility and discrimination, information sought to be elicited by respondent which could and did damage Feltz's job security, questioning being done by the president of respondent, and evasive answers by Feltz.[6] This evidence readily supports a finding that respondent violated § 8(a) (1) of the Act. Respondent's reliance on § 8(c) of the Act[7] is misplaced since there obviously was at least an implied threat, based on prior actions of respondent against union adherents, of reprisal involved herein.

Respondent alleges that the Board violated § 10(b) of the Act, 29 U.S.C.A. § 160(b), in improperly considering events, such as activity by respondent prior to the November 6, 1962, union election, which occurred more than six months prior to the filing of the instant charge, in ascribing to respondent an anti-union motive. § 10(b) sets forth a six-month statute of limitations for bringing unfair labor practice complaints. As stated by the United States Supreme Court in Local Lodge No. 1424, Int. Assc. of Machinists, AFL-CIO v. N. L. R. B., 1960, 362 U.S. 411, 416–417, 80 S.Ct. 822, 826–827, 4 L.Ed.2d 832, 837–838:

> "It is doubtless true that § 10(b) does not prevent all use of evidence relating to events transpiring more than six months before the filing and service of an unfair labor practice charge. However, in applying rules of evidence as to the admissibility of past events, due regard for the purposes of § 10(b) requires that two different kinds of situations be distinguished. The first is one where occurrences within the six-month limitations period in and of them-

---

6. Feltz gave answers such as " * * * it was much more than a union meeting". Further, Feltz answered "some" when Wilson, Sr., asked him how many attended the union meeting, perhaps suspecting that any other answer would lead to disastrous results for any employee whom he might name as being at the meeting.

7. § 8(c), 29 U.S.C.A. § 158(c), provides: "The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit."

selves may constitute, as a substantive matter, unfair labor practices. There, earlier events may be utilized to shed light on the true character of matters occurring within the limitations period; and for that purpose § 10(b) ordinarily does not bar such evidentiary use of anterior events. The second situation is that where conduct occurring within the limitations period can be charged to be an unfair labor practice only through reliance on an earlier unfair labor practice. There the use of the earlier unfair labor practice is not merely 'evidentiary,' since it does not simply lay bare a putative current unfair labor practice. Rather, it serves to cloak with illegality that which was otherwise lawful. And where a complaint based upon that earlier event is time-barred, to permit the event itself to be so used in effect results in reviving a legally defunct unfair labor practice."

Clearly in the instant case earlier events were used merely " * * * to shed light on the true character of matters occurring within the limitations period." The proof of unfair labor practices herein, i. e., the discharge of Feltz and interference with the employees' right to organize, does not depend merely on matters taking place beyond the six-month limitation period. For example, the antiunion animus of respondent can also be shown through its discharge, in February and March of 1963, of three of its employees working for the union during a time not affected by the limitations period. Also the interrogation of Feltz and Steinberg took place within the limitations period. Clearly the decision herein does not rely solely on events taking place beyond the limitations period and Local Lodge No. 1424 supports and does not defeat the instant result.

The Examiner did not pass upon the contention that, after the instant charge was filed herein by the union on August 9, 1963, the respondent, through Wilson, Jr., procured the cancellation of Feltz's impending engagement as a substitute minister in a small Baptist church in Marshalltown. The Examiner felt that this was a "delicate area" and "intimated to government counsel he might best stay out of [it]". Nevertheless, testimony was heard in connection with the incident when government counsel explained it involved certain economic consequences visited on Feltz, as well as injury to his standing.

As found by the Examiner, Wilson, Jr., was aware of the fact that Feltz was an ordained minister of the Baptist church. He introduced him as such and, on at least one occasion, invited him to lead a group of employees in prayer. Wilson, Jr., was a member of the board of trustees of the large (500 members) First Baptist Church in Marshalltown, to which Wilson, Sr., and Wiseman also belonged. Feltz was to substitute as minister in the smaller (75 members) Center Street Baptist Church during the absence of its regular pastor, Reverend Linser, in September of 1963. In mid-August, Wilson, Jr., called Reverend Hustad, the pastor of his church, First Baptist, and inquired "confidentially" into the "credentials of one Reverend Feltz". Wilson, Jr., gave no reason for his inquiry, but Reverend Hustad testified that he associated it with a prior talk Wilson, Jr., had with him concerning Feltz about July 10th, at which time Wilson, Jr., mentioned that "they had hired a minister in their plant" and gave "the inference * * * his work had not been particularly satisfactory as a workman". Reverend Hustad then made inquiry of Reverend Linser about Feltz. Reverend Hustad testified:

"I told him [Reverend Linser] that Reverend Feltz was employed by members of my congregation [the Wilsons] and that I had been informed that he [Feltz] had recently brought suit or complaint of unfair labor practice against them.

* * * * * *

" * * * I gave him the facts, and he said, 'I am glad you told me. I will not have a man who is taking

a fellow Christian to court speaking in the pulpit of my church.'"

Reverend Linser confirmed the conversation and testified, *inter alia*:

"Then he [Reverend Hustad] related to me the fact that the Wilsons had come to him and how they felt in their minds about the situation because of the case that was being filed against them by the National Labor Relations Board through the request of Pastor Feltz. And at that point my mind was opened up to the entire case.

"And, relating the two, I felt immediately, because of this conversation, that since our little church out there had so many problems and struggles, it would be far better if we would seek to decline having Brother Feltz speak rather than take sides in the issue that's being dealt with in this hearing right here. And we sought to evade it or take a middle-of-the road of the road [sic] stand and say, by not having Pastor Feltz, that we were not going to take sides for him and against people in the First Baptist Church in town."

Reverend Linser also testified that he was aware of the litigation when he first engaged Feltz to be a substitute during his absence, but that he "* * * did not know previous to Mr. Hustad's discussion that the Wilsons were in the First Baptist Church of Marshalltown".

The Examiner's sophistical reasons for stating that the treatment of Feltz occasioned by Wilson, Jr.'s inquiry was a "delicate area" and not to be dealt with were "* * * that a sound administration of the Act requires that we refrain from passing upon church policy regarding the selection or rejection of a minister" and that dealing with the matter "* * * entails internal considerations of church policy, and administration, which a due regard for administering this Act in harmony with other important policies would call upon us to refrain from entering, if at all possible." The Examiner did not pass upon this

matter, although he found "* * * it is an evidentiary item bearing on the motivation for termination with Respondent, and as such it merits some consideration".

We are here dealing with respondent's good faith and motivation. The church incident lends substantial support to the charge that respondent was not possessed of the good faith it claims motivated its actions. The evidence strongly suggests respondent used pressure to bar Feltz from employment as a minister or in any other capacity. Contrary to the Examiner's statements, church policy is not at issue here. We are concerned only with respondent's motivation in investigating Feltz's church affiliation and in the effects of such investigation. From this incident it becomes even more clear that respondent was discriminating against Feltz because of his union activity.

■ Respondent contends that the Board failed to sustain its burden of proof in support of its contention that Feltz was discharged because he gave testimony or filed charges under § 8(a) (4) of the Act, set out at f.n. 1, supra. The primary reason for this assertion is that, in fact, no testimony was ever given or charges ever filed by Feltz against respondent. The most that Feltz did was to prepare to testify against respondent by attending the meeting at the motel in Marshalltown on July 9, 1963. The cases dealing with giving testimony have invariably involved situations in which an employee has actually testified at a hearing. See, e. g., Nachman Corp. v. N. L. R. B., 7 Cir., 1964, 337 F.2d 421; N. L. R. B. v. Dal-Tex Optical Co., 5 Cir., 1962, 310 F.2d 58; N. L. R. B. v. Southern Bleachery & Print Works, Inc., 4 Cir., 1958, 257 F.2d 235, certiorari denied, 359 U.S. 911, 79 S.Ct. 588, 3 L.Ed. 2d 575; N. L. R. B. v. Viking Pump Co., 8 Cir., 1940, 113 F.2d 759, certiorari denied, 312 U.S. 680, 61 S.Ct. 449, 85 L.Ed. 1119. We are reluctant to hold that § 8(a) (4) can be extended to cover preliminary preparations for giving testimony. We note that the proven violations of § 8(a) (1) and (3) of the Act

stand independently, however, and do not fall by the Board's failure to prove that respondent violated § 8(a) (4) of the Act.

Enforcement of the Board's order is hereby granted except for 1(b) of the order (and that part of the Appendix relating to 1(b) of the order) which arises out of the alleged violation by respondent of § 8(a) (4) of the Act. Since we have held that petitioner has not sufficiently proved the violation of § 8(a) (4), the order will be enforced only as modified.