407 F.2d 247
 RUSSELL-NEWMAN MANUFACTURING COMPANY, Inc., Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
INTERNATIONAL LADIES' GARMENT WORKERS' UNION, AFL-CIO, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
 No. 25401.
 No. 25491.
 United States Court of Appeals Fifth Circuit.
 January 24, 1969.
 
 Fritz L. Lyne, Lyne, Klein & French, Dallas, Tex., for Russell-Newman Mfg. Co., Inc.
 David R. Richards, Mullinax, Wells, Mauzy, Levy & Richards, Dallas, Tex., for International Ladies' Garment Workers' Union, AFL-CIO.
 Marcel Mallet-Prevost, Asst. Gen. Counsel, Leonard Wagman, Atty., N.L.R. B., Washington, D. C., Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, for respondent.
 Before JONES and COLEMAN, Circuit Judges, and CHOATE, District Judge.
 COLEMAN, Circuit Judge:
 
 
 1
 On the first appearance of this case in this Court, 370 F.2d 980, we denied enforcement and remanded the case to the Board without prejudice to a further hearing to be conducted on two issues in keeping with the requirements of due process. These issues were:
 
 
 2
 (1). Whether a general wage increase granted to company employees at its non-union plant in Pilot Point, Texas, on January 28, 1965, while withholding an increase at another plant in Denton violated § 8(a) (1) of the National Labor Relations Act;
 
 
 3
 (2). Whether an advertisement to sell one of the company buildings in Denton, posted two days after the Union had won a representative election, was a similar violation.
 
 
 4
 The background of these issues may be found in our former opinion.
 
 
 5
 Upon remand, the record was reopened and another hearing was held.
 
 
 6
 Additionally, upon rehearing, the Examiner denied the request of the Union and the General Counsel that he include in the remedy an order that the respondent grant its employees in Denton the same wage increase granted at Pilot Point.
 
 
 7
 In the original proceedings, the Trial Examiner held that neither the failure to grant the increase at Denton nor the advertisement of the building constituted a violation. By a two to one vote, the Board reversed the Examiner and found that each of these items represented an unfair labor practice.
 
 
 8
 Agreeably to the remand, the Board returned the case to the Examiner who had originally heard it for the reception of further evidence as to the issues so remanded.
 
 
 9
 * At the reopened hearing the Company challenged the jurisdiction of the Board on the ground that these items, constituting amendments to the complaint, were not supported by a "charge" and that consequently the Board was without jurisdiction. The "charge" which initiated the former proceedings had not alleged these particular violations. The events occurred considerably after the complaint had issued. The "charge" was never amended, but before the first hearing the complaint was amended specifically to include these items.
 
 
 10
 Section 10(b) of the Labor Relations Act states:
 
 
 11
 "Whenever it is charged that any person has engaged in or is engaging in any such unfair labor practice, the Board, or any agent or agency designated by the Board for such purposes, shall have the power to issue and cause to be served upon such person a complaint stating the charges in that respect * * *."
 
 
 12
 We hold that the jurisdictional attack is not well taken. We base this decision solely upon the particular facts and circumstances of this case. The purpose of the charge is to set in motion the Board's investigating machinery, after which the complaint is filed. It is the complaint, not the charge, which gives notice to the party of the exact nature of the charges, Texas Industries, Inc. v. N. L. R. B., 5 Cir., 1964, 336 F.2d 128, 132. Here, especially by virtue of the remand, the Company had complete notice of the violations alleged and adequate time in which to prepare its defense. See N. L. R. B. v. Kohler Company, 7 Cir., 1955, 220 F.2d 3.
 
 II
 
 13
 As to the facts underlying the wage increase and the proposed sale of the buildings, the Trial Examiner found and concluded upon rehearing that there was nothing new in the evidence beyond that originally "offered" by the Company in the first proceedings [which it had no opportunity to present in the form of actual proof] so there was nothing to alter the Board's determination that these two acts did constitute violations. Thus the Examiner felt that he had no authority or function other than to find and conclude in keeping with the original findings and conclusions of the Board. It is now argued that since the Examiner made no new findings or conclusions of his own, he merely rubber stamped the original findings and conclusions of the Board [reversing what he had first found and concluded], hence the terms of the remand were not complied with. We do not agree, however, because the case was reopened and the Company was given the opportunity to present and did present evidence in support of its position. Moreover, the Examiner, in the exercise of his function, did find and conclude that there was nothing new in the evidence beyond that contained in the original "offer of proof". This complied with the mandate and we must now decide the case on its merits.
 
 III
 
 14
 In this regard, we have held that the credibility findings of a Trial Examiner are entitled to special weight and are not to be easily ignored, Pratt & Whitney Aircraft Division of United Aircraft Corporation, Florida Research and Development Center, v. N. L. R. B., 5 Cir., 1962, 310 F.2d 676. Although the Board may not overrule an examiner by ignoring credible evidence of a witness and drawing inferences from tenuous circumstances, it is not compelled to follow the examiner or his findings conflicting with well supported inferences drawn from other parts of the record. This is particularly true of testimony given by an interested witness, relating to his own motives, N. L. R. B. v. Pyne Molding Corp., 2 Cir., 1955, 226 F.2d 818. If the Trial Examiner and the Board reach different conclusions, the Board's findings must be sustained if they are supported by substantial evidence on the record as a whole, Universal Camera Corp. v. N. L. R. B., 340 U. S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); N.L.R.B. v. Akin Products Company, 5 Cir., 1953, 209 F.2d 109.
 
 IV
 
 15
 As to the proposed sale of the building, we can do no better than to quote the findings of the Trial Examiner.
 
 
 16
 "(1) The `Masonic Building,' the one where the controversial `For Sale' signs were placed following the election in Denton, served as a main sewing room and is one of several building used there in the total operation.
 
 
 17
 "(2) While the title to the building involved was not vested in Respondent (and was in Newman Realty Company, a corporation) the relationship between the Respondent and the owner of the building is such that the decision to sell it is in legal effect the decision of Respondent, and is so regarded by Respondent itself.
 
 
 18
 "(3) As a part of a comprehensive plan to construct a one-story building that would house Respondent's entire Denton operation, conducted in several buildings, the decision to sell the Masonic Building was made as early as 1960. The sale as of that time was placed in the hands of a real estate agent; that periodically since then efforts of varying intensity had been made to sell the building, directly with prospective buyers and occupants, through the Chamber of Commerce of Denton, and through various real estate agents; that Z. L. McCart, realtor, sought to sell the building for several months, beginning in 1962 and advertised it in the Wall Street Journal, and still holds it for sale; that in January of 1965 Joe Barns, realtor, obtained an exclusive listing so that he would be authorized under local law to advertise it in the manner he desired; he placed the for sale signs, in question, in windows of the building on two adjoining streets on his own initiative and not at the request of any of Respondent's management personnel; that the first signs were standard `For Sale' signs used by his Company, placed temporarily until signs especially prepared for this particular building could be obtained from sign painters; that the temporary signs went up 2 or 3 days after January 29, 1965 and probably on the Sunday following that date, the date the agreement listing the building with Barns was signed; that the language on the temporary or first signs read For Sale, Barns Realty Company, Jean & Joe Barns, and in addition the telephone number of the agents; the especially prepared signs went up to replace the first ones about a week after they had been placed and carried this sales message: `This 18,000 Sq. Ft. Air Conditioned Bldg. For Sale Barns Realty, Phone 382-2509'; these permanent signs stayed in place as long as Barns exclusive listing was effective, approximately 7 months; that the building as of the date of the reopened hearing remained unsold, but the effort to sell continued.
 
 
 19
 "(4) That a new structure, large enough to house Respondent's entire operation at Denton has been built and is in use; that one of the older buildings formerly used at the Denton operation by Respondent, has been sold.
 
 
 20
 "(5) No evidence was offered in behalf of the General Counsel to establish that the signs posted in the building attracted the attention of any employees; nor was there any offered by Respondent to establish that employees had any knowledge of the earlier effort to sell the building."
 
 
 21
 In summary, the trial examiner found that the decision to sell the building, one of several buildings at the Denton plant, had been made several years earlier as a part of a comprehensive plan to construct a new building to house the entire Denton operation. At that time the plans for the sale were placed in the hands of a real estate agent and periodic attempts, through the local Chamber of Commerce and real estate agents, were made to complete the sale. In 1965, a realtor, Joe Barns, obtained an exclusive listing so that he could advertise it as he desired. He put the "For Sale" signs on the building on his own initiative, but with knowledge of the Company, two days after the election, which the Union had won. The Board, 167 N.L.R.B. #152, expresses no criticism of the foregoing findings of the trial examiner. It was content to point out that at least one employee at Pilot Point knew of the building being advertised at Denton.
 
 
 22
 The 8(a) (1) attack on advertising the building cannot be squared with the principles announced by the Supreme Court in Textile Workers Union of America v. Darlington Manufacturing Company, 380 U.S. 263, 85 S.Ct. 994, 13 L.Ed.2d 827 (1965).
 
 There the Court said:
 
 23
 "[S]ection 8(a) (1) provides that it is an unfair labor practice for an employer `to interfere with, restrain, or coerce employees in the exercise of' § 7 rights. Naturally, certain business decisions will, to some degree, interfere with concerted activities by employees. But it is only when the interference with § 7 rights outweighs the business justification for the employer's action that § 8(a) (1) is violated. See, e. g., [National] Labor [Relations] Board v. [United] Steelworkers [of America], 357 U.S. 357 [78 S.Ct. 1268, 2 L.Ed.2d 1383]. Republic Aviation Corp. v. Labor Board, 324 U.S. 793 [65 S.Ct. 982, 89 L.Ed. 1372]. A violation of § 8(a) (1) alone therefore presupposes an act which is unlawful even absent a discriminatory motive. Whatever may be the limits of § 8(a) (1), some employer decisions are so peculiarly within matters of management prerogative that they would never constitute violations of § 8(a) (1), unless they also violated § 8 (a) (3). Thus it is not questioned in this case that an employer has the right to terminate his business, whatever the impact of such action on concerted activities, if the decision to close is motivated by other than discriminatory motives. But such action, if discriminatorily motivated, is encompassed within the literal language of § 8(a) (3)."
 
 
 24
 There is no evidence that this proposed sale was for discriminatory reasons. The undisputed proof over-whelmingly established that it was a matter of business, from which the employees would benefit in the construction of a new building, with all operations under one roof instead of in several buildings. The sincerity of the motive is proven by the fact that this new building at the time of the second hearing had been completed and occupied. It was a long range plan, originated years before the election and accomplished after the Union had won at Denton. That one employee at another plant, eighteen miles away, not a part of the bargaining unit recognized by the Board, knew that the building was advertised creates, in the light of this record, no substantial inference that the employee considered it to have been for a discriminatory purpose.
 
 
 25
 Neither can we ignore the fact that in its original order [153 N.L.R.B. 105; 370 F.2d 980] the Board sustained its position by coupling the advertisement with a speech made by a company official which it considered to be a clear threat but which this Court found to be unobjectionable, 370 F.2d at 985.
 
 
 26
 Therefore, this portion of the Board order is not due for enforcement.
 
 V
 
 27
 We turn next to the wage increase at Pilot Point, an issue which is excruciatingly close. Our function, however, is not that of a court of original jurisdiction but rather to determine, as already stated, whether Board action is supported by the record as a whole.
 
 
 28
 The Company operated two plants. The Union prevailed in the election at Denton on January 26, 1965. Two days later the employees at Pilot Point received an hourly increase of five cents in their wages. Coming precipitately on the heels of the Union victory at one plant, was this wage increase reasonably calculated to induce the employees not to join or support the Union? Was it calculated to interfere, or did it interfere, with employee rights in that regard?
 
 
 29
 Considering first the substantive aspects of the issue, there can be little dispute as to the applicable law.
 
 
 30
 In N. L. R. B. v. Exchange Parts Company, 375 U.S. 405, 84 S.Ct. 457, 11 L.Ed.2d 435 (1965), a case which arose in this Circuit, the Supreme Court held that § 8(a) (1) "prohibits not only intrusive threats and promises but also conduct immediately favorable to employees which is undertaken with the express purpose of impinging upon their freedom of choice for or against unionization and is reasonably calculated to have that effect".
 
 The Court further held:
 
 31
 "The danger inherent in well-timed increases in benefits is the suggestion of a fist inside the velvet glove. Employees are not likely to miss the inference that the source of benefits now conferred is also the source from which future benefits must flow and which may dry up if it is not obliged. The danger may be diminished if, as in this case, the benefits are conferred permanently and unconditionally. But the absence of conditions or threats pertaining to the particular benefits conferred would be of controlling significance only if it could be presumed that no question of additional benefits or renegotiation of existing benefits would arise in the future; and, of course, no such presumption is tenable."
 
 
 32
 * * * * * *
 
 
 33
 "The beneficence of an employer is likely to be ephemeral if prompted by a threat of unionization which is subsequently removed. Insulating the right of collective organization from calculated good will of this sort deprives employees of little that has lasting value."
 
 
 34
 In the application of these principles, several factors may be taken into consideration: (1) Background activities of the employer, evidencing an anti-union attitude, Hendrix Mfg. Co. v. N. L. R. B., 5 Cir., 1963, 321 F.2d 100; (2) The timing of the wage increase, Lincoln Mfg. Co. v. N. L. R. B., 7 Cir., 1967, 382 F.2d 411; (3) Employer's knowledge of union activity, N. L. R. B. v. Douglas & Lomason Co., 8 Cir., 1964, 333 F.2d 510; and (4) The relation of the wage increase to past practices, N. L. R. B. v. Laars Engineers, Inc., 9 Cir., 1964, 332 F.2d 664.
 
 
 35
 At the first hearing the Trial Examiner heard only one witness as to the wage increase, a vice president of the Company. The Examiner held, and properly so, that there was nothing to refute his testimony except inferences which might be drawn from the fact of the election, the fact of the existence of an organizational campaign by the Union at the Pilot Point plant, and the timing of the wage increase. He found and concluded that the Company was justified in granting the wage increase and that it did not unlawfully interfere with the rights of the employees under the Act. He saw no reason to discredit the witness and gave full credence to his testimony. That testimony was to the effect that the wage increase would have been given six months previously had it not been for the intervention of the Union organizational campaign at both Denton and Pilot Point; that it was not given sooner on advice of counsel for the reason that such might be interpreted as an 8(a) (1) violation; that the increase was in keeping with a consistent pattern of several increases at Pilot Point beginning in 1959 and running through 1965, with the exception of 1961, when a greater increase was required because of the minimum wage law.
 
 
 36
 The Board disagreed with these findings and conclusions on the ground that the day after the Denton election the Union, with the knowledge of the Company, passed out a leaflet at Pilot Point announcing its victory at the Denton plant and soliciting the employees to go and do likewise, to which was attached a union authorization card. The Board held: "The granting of the wage increase to the Pilot Point employees during an organizational campaign, but not to Denton employees, two days after the latter voted for the Union, and a day after the Union's known solicitation of authorization cards from the Pilot Point employees, constituted an inducement to those employees not to support the Union". Therefore, expressly applying Exchange Parts Company, supra, the Board, contrary to the Trial Examiner, found that by granting the wage increase the Company violated § 8(a) (1).
 
 
 37
 At the first hearing the Company Vice President testified as follows:
 
 
 38
 "Q. When did you first see this leaf-let?
 
 
 39
 "A. Well, it was the day after the election [the day the circulars were circulated at Pilot Point] or within the week after the election. It was shortly after the election."
 
 
 40
 After the second hearing, the Board reaffirmed "our finding that Respondent had knowledge of the Union's organizational activity at the Pilot Point plant at the time the increase was granted".
 
 
 41
 We are compelled to hold that this action of the Board is not without substantial support in the record as a whole. The same could be said of the findings and conclusions of the Trial Examiner, but the Board [page 6 ante] had the final say. Under all the facts and circumstances of this case, including inferences reasonably to be deduced therefrom, we are without authority to overturn the Board action.
 
 
 42
 Therefore, the § 8(a) (1) order as to the wage increase at Pilot Point will be enforced.
 
 VI
 
 43
 The Board was within its discretion in declining, on remand, to include a backpay increase to the Denton employees, then in a bargaining status pursuant to the Union victory at the polls. Our remand was not general. It was specific, directed to the hearing and determination of the § 8(a) (1) allegations. This portion of the order, therefore, is affirmed.
 
 VII
 
 44
 Enforcement of the § 8(a) (1) order as to the wage increase at Pilot Point, granted.
 
 
 45
 Enforcement of § 8(a) (1) order as to the proposed sale of the building at Denton, denied.
 
 
 46
 The Board action, declining, for the first time on rehearing, to include a backpay increase to the employees at Denton, affirmed.