**FAIRCHILD CAMERA AND INSTRU· MENT CORPORATION, a Corporation, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 19237.**

United States Court of Appeals
Eighth Circuit.

Dec. 12, 1968.

Ralph Baird, Joplin, Mo., for petitioner.

Ronald Wm. Egnor, Atty., N.L.R.B., Washington, D. C., for respondent; Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallett-Prevost, Asst. Gen. Counsel, Leonard M. Wagman, and Edward E. Wall, Attys., N.L.R.B. filed brief of respondent.

Before VOGEL, LAY and BRIGHT, Circuit Judges.

VOGEL, Circuit Judge.

Petitioner, Fairchild Camera and Instrument Corporation, is a Delaware cor-

poration authorized to engage in business in Missouri and has a place of business in Joplin, Missouri wherein it is engaged in the manufacture, distribution and sale of goods in interstate commerce within the meaning of §§ 2(6) and 2(7) of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq. On September 15, 1966, petitioner's employees held a representation election, wherein the International Brotherhood of Electrical Workers, Local No. 95, AFL-CIO, (hereinafter referred to as the union) received 117 votes, an intervening labor organization, International Association of Machinists and Aerospace Workers, received 3 votes, and 114 employees cast votes against representation. Because the results were inconclusive, a runoff election was held on October 6, 1966. In the runoff election, 103 employees voted for and 137 voted against the union. In objections to the runoff election, the union, as the charging party, alleged that during the period between the two elections (i. e., from September 15, 1966, to October 6, 1966) the company called meetings of its employees for the purpose of hearing and adjusting employee grievances and promised its employees a paid sick leave plan and other benefits, its object being to interfere with a free choice by its employees at the runoff election of October 6th, and that it thereby violated § 8(a) (1) of the Act. The Board, adopting the findings, conclusions and recommendations of its Trial Examiner, ordered that the company cease and desist from further conducting like meetings, post notices, and hold a second runoff election at such time as the Regional Director deemed appropriate. The company has petitioned this court to review and set aside the Board's order.[1] The Board has filed cross-application requesting that its order be enforced. This court's jurisdiction is based upon § 10(f) of the Act.

The only issue presented is whether the record as a whole contains substantial evidence supporting the Board's finding that

" * * * in conducting the meeting with groups of employees to have them air their grievances, in posting the seniority list of its production workers and in making veiled promises to grant them a paid sick leave plan and other benefits pursuant to the complaints which Respondent had invited its employees to air, was motivated by a desire to bring about the defeat of the Union in the runoff election and that such conduct constituted interference with the employees' organizational rights within the meaning of Section 8(a) (1) of the Act."

We find that the record does not support the Board's finding and accordingly deny enforcement.

To resolve the question, it is necessary to review the entire record, including a transcript of the full hearing held before the Trial Examiner.

Only five witnesses were called at the hearing before the Trial Examiner. Milton B. Johnson, industrial relations manager for the employer, was called as a witness by and on behalf of the General Counsel. He testified generally that about July 1966 he first became aware that the union was conducting a campaign at the employer's plant and that the representation election was held on September 15, 1966, and the first runoff election, on October 6, 1966. Meetings with groups of from 8 to 20 employees each were conducted by the company on September 20, October 3 and October 4, 1966. Mr. Johnson stated that he held these meetings "at the employees' request" for the purpose of answering questions pertaining to "production, policy or safety". Questions were asked by employees with regard to sick leave and the problem of a gravel parking

---

1. The question of the propriety of an appeal from that portion of the Board's order directing that a second runoff election be held is now moot. We are informed by counsel that such election has been held and resulted in a vote against the union.

lot which continuously developed potholes. Complaints were raised about seniority and about an employee, Barbara McGarrah, who was a National Aeronautics and Space Administration (NASA) instructor paid at instructors' rates even while doing the same work as other employees. Mr. Johnson testified that after one of the meetings a seniority list was posted, but that such seniority list had always been available to the employees. He also testified that on December 19, 1966, the company announced a sick leave plan and wage increase, both effective on January 1, 1967, and that prior to the meetings at issue previous conferences had been held with employees in March 1966 and in late 1965. On cross-examination, Mr. Johnson stated that the employer had operated this plant since 1961 and that in each of the years 1961, 1962, 1963, 1964, 1965 and 1966 the company had granted the employees a general wage increase plus fringe benefits with the exception of 1963, when the company's wage and fringe benefits survey indicated that only a wage increase was justified.

With regard to the effect of the employer having granted a sick leave plan and wage increase on December 19, 1966, effective January 1, 1967, the Examiner, whose findings and conclusions were approved and adopted by the Board, held that such granting of sick leave benefits

and wage increases did not amount to an unlawful interference with the employees' organizational plans.[2] Accordingly, no further consideration will be given to that part of the testimony referring to wage increases and fringe benefits.

Donald Ray Noe, an employee of the company for five years, testified that he attended a conference on October 3, 1966; that such conference was announced by his supervisor; that the meeting was informal, "more or less a question and answer period"; that Mr. Johnson told the employees " * * * that his was a meeting just to take up our gripes or any questions we might have concerning the company policy and he stressed the point it wasn't a meeting to try to determine whether we were going to vote for the union or not, it was strictly to take up our gripes"; that the conference was primarily attended by new employees not sure of some of the company's policies; that Mr. Johnson suggested that these employees study the company's handbook; that nothing was said inconsistent with Noe's general understanding of the employer's handbook; that a seniority list was posted following this meeting; and that there were no promises with regard to benefits or the parking lot complaint, there were no threats, and he did not feel "coerced". Mr. Johnson explained that the parking lot problem had been under consideration

---

2. The Examiner's finding in this regard is as follows:

"C. The Grant of a Paid Sick Leave Plan to Production Workers Subsequent to the Runoff Election

"It is undisputed that on December 19, 1966, more than 2 months after the date of the runoff election but while objections to the election were still pending, Respondent announced to its production workers that it was granting them a paid sick leave plan which, together with a general wage increase, would be put into effect on January 1, 1967. It is alleged that the announcement of the paid sick leave plan was an unlawful interference with the employees' organizational rights. I do not agree. The record shows that as a result of surveys which it conducts

each year as to what wage increases and fringe benefits are warranted, Respondent has granted a general wage increase each year since it opened its plant in 1961 and has added fringe benefits every year except in 1963. It is a fair inference therefore that, regardless of whether any union was then seeking to represent its production workers, Respondent would have granted the paid sick leave or some other fringe benefits to its employees in 1966. Indeed, a failure of Respondent to follow its established policy in this regard because of the pendency of the representation question might itself have subjected Respondent to an unfair labor practice charge. Dan Howard Manufacturing Co., 158 NLRB 805, 813."

for some time but that the company was contemplating expansion of the plant and did not want to pave the parking lot and then have to tear it up again upon such planned expansion. On redirect examination, Mr. Noe testified that the next previous conference with employees had been held about a year before and that "[i]t was primarily the same thing, taking up our gripes or any questions we might have". On recross-examination, Mr. Noe stated that the employer maintained "the open door policy", which meant the right of employees to see Johnson at any time.

Helen Marie Yust, an employee for three years, testified that she attended one of the conferences at the direction of her foreman's supervisor; that Johnson

"* * * opened the meeting with the statement that the company felt there was some unrest in the plant among the employees and he called the meeting and he thought perhaps he might get some ideas of what was wrong out there, that they had held these meetings in the past. It was the practice of the company to do that and they had been helpful";

that the employees asked questions, "probably the most outstanding [of which] was over the pay of the NASA instructor", referring to Barbara McGarrah; that one of the employees suggested that while the NASA instructor "wasn't instructing that perhaps he could find another job for her instead of putting her alongside the production workers doing the same work for a higher rate of pay"; and that sick leave and wages were discussed. She testified:

"The subject of wages was brought up. Mr. Johnson said in the past they had run surveys to determine if a wage increase was in order and at that time there had been or was being run a survey and at that time he could not make any announcement as to what the outcome of that survey might be."

Although Mr. Johnson described the office personnel's sick leave plan at this meeting, "he didn't make any statement whatsoever to offer any sick leave plan or anything like that". She also said that a seniority list was posted. With regard to the calling of conferences, she testified that she didn't know any employee who requested the meetings, although "there has been times when people have asked for conferences".

Martha Lewis, an employee of four years' standing and an observer for the union at both elections, presented about the same testimony as the prior witnesses. She testified that Johnson "said this was the place for any complaints, gripes or suggestions to be heard, and he was wanting us to talk about anything that we wished to talk about"; that

"* * * Mr. Johnson was asked by one of the girls if the office had a sick leave why we couldn't have, and he said it was being contemplated and the fact it had been such a success with the office group at that time, he said that he was mildly surprised that it worked out as well as it did but it had, and they were contemplating it [for the production employees] in the future";

and that Johnson told them with regard to the parking lot problem that the company had no plans to improve the situation. The fairness of the NASA instructor's situation was also questioned at this meeting. She further testified that seniority was not discussed, but that a seniority list had been posted after the meeting.

The last witness called on behalf of the General Counsel was Juanita Crossley, an employee for approximately six years, who had attended the same conference as Helen Yust. She testified that Johnson opened the meeting by stating that he had called it to see "if there was anything or any trouble that he could help us with, why, we would try to straighten it out."

As to the problems raised at that meeting, she testified:

"One of the biggest issues that came up was Barbara McGarrah. Barbara McGarrah was our NASA instructor and I think I explained that to Mr. Guerin when he talked to me, what the company paid Barbara McGarrah when she was a NASA instructor. If they paid her $5 an hour, the girl earned it. When she came out on the floor doing production work beside the other girls doing the identical same thing and she was paid, as I understood, $2.38 an hour where we were getting $1.97, and someone suggested that she should be given a different title, either make her a lead girl and take her out of production category, which would eliminate the hard feelings that there were or else raise our wages.

"Q Were there any other subjects discussed or questions propounded?

"A Yes. One girl brought up the subject of sick pay and Mr. Johnson said that they had put sick pay into effect in the office and had had it in effect for about a year. They were trying to work something out for the production workers but as of yet had not come up with anything. And he also said that on an average the ones that they had kept a record and with the girls in the office that had the benefit of the sick pay, that it showed that there wasn't any more absenteeism. It averaged out about the same.

"Q Were there any other subjects discussed at this conference?

"A The seniority list was brought up. One of the girls said that we had asked to have a seniority list posted several times and it had been—well, there hadn't been anything done about it.

"Q Was the seniority list later posted?

"A Yes."

Aside from the question of sick pay and increased wages, which very properly was taken out of consideration by the Trial Examiner and the Board in adopting the Trial Examiner's findings, there remains nothing but the following: (1) The request for and the posting of the seniority list, with the undisputed testimony that it had been available to any employee who asked for it in the company office; (2) complaints with reference to Barbara McGarrah; and (3) complaints about the employees' parking lot. There were no promises, no threats and no coercion. On the basis of these items, the Examiner and the Board would find the employer guilty of engaging in unfair labor practices, in violation of § 8(a) (1).

Of course, we realize that the Board's findings must be upheld under 29 U.S.C.A. § 160(e) if supported by substantial evidence in the record considered as a whole. N. L. R. B. v. Walton Mfg. Co., 1962, 369 U.S. 404, 405, 82 S.Ct. 853, 7 L.Ed.2d 829; Universal Camera Corp. v. N. L. R. B., 1951, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456; N. L. R. B. v. Coachman's Inn, 8 Cir., 1966, 357 F.2d 134, 137; N. L. R. B. v. Ritchey Mfg. Co., 8 Cir., 1965, 354 F.2d 90, 97–98; Independent Stave Co. v. N. L. R. B., 8 Cir., 1965, 352 F.2d 553, 558, cert. denied, 1966, 384 U.S. 962, 86 S.Ct. 1588, 16 L.Ed.2d 674. However, these and numerous other authorities support the corollary proposition that such findings should be set aside when there is not sufficient evidence to support them. See Fabri-Tek, Inc. v. N. L. R. B., 8 Cir., 1965, 352 F.2d 577, 583; N. L. R. B. v. Council Mfg. Corp., 8 Cir., 1964, 334 F.2d 161, 163.

We find nothing in the record which could substantially support the contention of the Examiner and the Board and are convinced that such evidence as was offered failed of its purpose. The charging party, the Examiner and the Board may have been suspicious of Johnson's actions in calling the conferences between the two elections, but mere suspicion will not support a violation. Banner Biscuit Co. v. N. L. R. B., 8 Cir., 1966, 356 F.2d 765, 771.

The evidence here fails to rise above the level of suspicion.

The order of the Board is set aside and the cross-application for enforcement is denied.