**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**HAWTHORN COMPANY, a Division of Kellwood Company, and New Haven Manufacturing Company, Respondents.**

No. 19248.

United States Court of Appeals Eighth Circuit.

Jan. 3, 1969.

Ronald W. Egnor, Attorney, N.L.R.B., for petitioner; Arnold Ordman, Gen. Counsel, N.L.R.B., Dominick L. Manoli, Associate Gen. Counsel, N.L.R.B., Marcel Mallet-Prevost, Assistant General Counsel, N.L.R.B., and Elliott Moore, Attorney, N.L.R.B., were on the brief with Mr. Egnor.

Frederick S. Kullman, of Kullman & Lang, New Orleans, La., for respondent, Hawthorn Company; Richard C. Keenan, New Orleans, La., was on the brief with Frederick S. Kullman, New Orleans, La.

Donald K. Althauser, of Randolph E. Puchta, Hermann, Mo., for respondent, New Haven Manufacturing Co. No brief was filed by New Haven Manufacturing Company.

Before VOGEL, LAY and BRIGHT, Circuit Judges.

BRIGHT, Circuit Judge.

The National Labor Relations Board, pursuant to 10(e) of the National Labor Relations Act, as amended, 29 U.S.C. § 160(e), petitions for enforcement of its order requiring respondents to cease and desist from certain unfair labor practices and to reinstate certain named employees who had been subject to discrimination on account of their union activities.[1] Because of the relationship between the two respondents, the cases against both employers were consolidated for hearing. The Board's opinion is reported in 166 N.L.R.B. No. 20 (1967).

On June 29, 1967, the Board determined that the respondent Hawthorn Company (Hawthorn) had engaged in and was engaging in acts violating § 8 (a) (1)[2] which interfered with their employees' right of self-organization guaranteed by § 7[3] of the Act. The offending incidents were:

(a) Coercion and restraint of employees in union organizational activities through company surveillance of a union meeting by supervisor Victor Hoerstcamp;

(b) Inhibiting the union activity of Hawthorn employee William Cooke, a leading spokesman of the union, by having foreman Earl Hagedorn sit near him at coffee-break periods to spy on Cooke and to inhibit any pro-union advocacy among employees;

(c) Reading of statements by supervisors to Hawthorn's employees which conveyed to employees management threats that selection of the union endangered their jobs; and

(d) Interfering with employees' rights to freely choose a union by showing to assembled employee groups during working hours an anti-union piece of propaganda in the form of a motion picture entitled "And Women Must Weep".

Additionally, the Board determined that Hawthorn, in suspending Cooke for three days and discharging John Oliver, had done so for the purpose of discouraging union organizational activities in violation of § 8(a) (3) of the Act. Hawthorn denied all charges.

Both Hawthorn and New Haven Manufacturing Company (New Haven) were engaged in the manufacturing and sale of tents, tarpaulins and related products in New Haven, Missouri. New Haven, selling ninety per cent of its products to Hawthorn, is practically a captive producer for Hawthorn. Unfair labor practices found against New Haven include a § 8(a) (1) violation in unlawfully interrogating employee Walter Meyer about his union activities and threatening him with discharge if he should sign a union card and a § 8(a) (3) and (1) violation in discharging Meyer for his general pro-union activity. New Haven asserts that it had legitimate business reasons for discharging Meyer. It does not here contest the § 8(a) (1) violation.

Our standard of review is whether the Board's conclusions are supported by substantial evidence. Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); Fairchild Camera and Instrument Corp. v. NLRB, 404 F.2d 581 (8th Cir., Dec. 12, 1968).

The union campaign against both respondents began in December of 1965. Cooke and Oliver, both of whom are employed by Hawthorn, and Meyer of New Haven were early adherents to the union cause. Both companies were strongly opposed to unionization and Hawthorn in particular engaged in a well-organized campaign to defeat the unionization effort. Hawthorn's supervisory personnel were used by management to carry the anti-union message to the employees. The actions of Hawthorn's foreman Earl Hagedorn played a significant role in several of the unfair labor practices.

1. The union here involved was Textile Workers Union of America, AFL-CIO.

2. 29 U.S.C. § 158(a) (1).

3. 29 U.S.C. § 157.

■ The first union organizational meeting was scheduled for January 23, 1966, at Stoney Hill Hall, which was located on a remote country road. While making a delivery at the Hawthorn plant, Walter Meyer, a New Haven employee, exhibited a notice of this meeting to a Hawthorn employee, Holliman. Foreman Hagedorn, who was in the vicinity, examined the notice and brought it to the attention of his own supervisor Rothmeyer. Coincidentally or otherwise, three Hawthorn foremen were present at Stoney Hill Hall when the meeting was held. These men did not attend the meeting but were in a public bar on the lower floor of the building. A fourth supervisor, Victor Hoerstcamp, who lived about twelve or thirteen miles from the meeting place, was observed slowly driving past the meeting place several times. Hoerstcamp did not testify. There is no evidence in the record that he had any reason, other than surveillance of the meeting, for so travelling this little-used country road. The trial examiner determined that Hoerstcamp was in the vicinity of the meeting for the purpose of intimidating employees in the exercise of their § 7 rights. The record as a whole sustains the trial examiner's conclusions and the Board's adoption thereof.

Respondent Hawthorn suggests that Hoerstcamp's presence in the area ought not be deemed a coercive act because other supervisors were present in the bar and the General Counsel admitted that their presence might have been accidental since one or more of such foremen lived in the vicinity.

The presence of three foremen at the bar, at best a suspicious circumstance, does not help respondent's position. Their possibly accidental appearance would not negate a finding that Hoerstcamp was present for an unlawful purpose. This is particularly true in light of the strong anti-union position taken by Hawthorn and transmitted to the employees prior to the date of the union meeting. See, for example, Jas. H. Matthews & Co. v. NLRB, 354 F.2d 432 (8th Cir. 1965), cert. den., 384 U.S. 1002, 86 S.Ct. 1924, 16 L.Ed.2d 1015 (1966); NLRB v. Ritchie Mfg. Co., 354 F.2d 90, 93, 98 (8th Cir. 1965).

Another illegal surveillance charge directly involved foreman Hagedorn. About December 8, 1965, Hagedorn read to the men under him a company statement setting forth a strong anti-union position. William Cooke was a member of Hagedorn's captive audience and, following the conference, remarked to Hagedorn: "Earl, you don't really believe that shit". Cooke later made his pro-union sentiments felt by distributing a signed leaflet [4] to rebut the company's anti-union propaganda film, "And Women Must Weep", discussed *infra*. The leaflet also suggested that unionization is the best means of obtaining better wages and job security. Immediately thereafter, Cooke noted two changes in his relationship with Hagedorn. Hagedorn increased the number of times he was in Cooke's work area; instead of sitting with the other foremen in the cafeteria during the coffee breaks as had been his practice, Hagedorn began to sit as close to Cooke as he could get. One of Cooke's fellow employees testified that it looked like "Earl" was following Cooke around wherever he would go.

4. The leaflet read in part:
   "[W]e were shown a movie, written, directed, and sponsored by management of industry with actors hired by them. It was purposely a biased and distorted picture against Unions. I feel that someone must speak out against this attempt by management to instill fear of unionism.
   *       *       *       *       *
   They boast that they are the largest producers of canvas products in the country and yet continue to pay the lowest wages allowed by law. Do you think they opened a plant in New Haven just so we could have jobs? No! They were looking for the cheapest labor available, and found it here. The price of living continues to increase but *HAWTHORNE WAGES REMAIN THE SAME*. It must not go on, but only we, the employees at Hawthorne can remedy this."

Hagedorn testified that he was not spying on Cooke and that he sat with the employees in order to hold them to an established ten-minute coffee break. The examiner felt that the evidence was not sufficient to establish any illegal surveillance of Cooke. The Board reversed the examiner on this issue stressing the testimonial admission of Hagedorn that he could have just as easily terminated the coffee break while sitting at the foreman's table only six feet away by saying, "Come on, let's go".

The difference in result between the examiner and the Board was based on the weighing of the evidence, not on a credibility determination of the examiner which would be binding upon the Board and us. The Board has the right to independently weigh the evidence even though credibility determinations are the prerogative of the trial examiner.[5] We feel that an evaluation of the record as a whole supports the Board's finding on this issue. See, e. g., Jas. H. Matthews & Co. v. NLRB, supra; NLRB v. Ritchie Mfg. Co., supra; cf. NLRB v. Monroe Auto Equipment Co., 368 F.2d 975 (8th Cir. 1966).[6] See also, Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

Cooke's pro-union leaflet, distributed by the union after the showing of "And Women Must Weep", did not go unnoticed or unanswered. On February 9, 1966, the company posted a "NOTICE TO ALL EMPLOYEES" on all bulletin boards including one at the small shop where Cooke, Oliver and another man worked—about one hundred feet from the main plant. The bulletin recites:

"One of our employees recently distributed a union leaflet which he signed as a member of the 'Hawthorn Employees Organizing Committee.' We have not been notified of any other employees belonging to this so called 'committee' but we do want everyone to clearly understand that *no employee is going to receive any preferred or special treatment just because he joins or becomes a part of a union 'organizing committee.'* A few people may be working under the mistaken belief once they join this 'organizing committee,' the company can no longer take any action against them. *We do not want there to be any misunderstandings.*

Persons on the 'organizing committee' will *not* receive preferred treatment here at Hawthorn Co. These people will be subject to the same rules, policies and regulations as everyone else, and they will continue to be subject to the same disciplinary action, including discharge for cause. We also want it further understood that no employee will ever have to join or support a union in order to hold his job here, and that each employee will be protected in his right to *refuse* to join or support a union."

5. The independent weighing of the evidence is a Board function. See, e. g., NLRB v. A–1 Excelsior Van & Storage Co., 403 F.2d 959 (8th Cir., Dec. 3, 1968); Portable Electric Tools, Inc. v. NLRB, 309 F.2d 243 (7th Cir. 1962). We consider the examiner's contrary conclusion as a factor in our review of the record to determine whether "substantial" evidence supports the Board's conclusion on this issue. Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). Cases holding that a trial examiner's credibility determinations are binding on the Board are inapplicable in this case, since the Board did not overturn the examiner's credibility determinations. See, NLRB v. Finesilver Mfg.

Co., 400 F.2d 644 (5th Cir. 1968); NLRB v. Aycock, 377 F.2d 81, 87 (5th Cir. 1967); NLRB v. Coletti Color Prints, Inc., 387 F.2d 298, 301–303 (2nd Cir. 1967); Rocky Mountain Natural Gas Co. v. NLRB, 326 F.2d 949, 952 (10th Cir. 1964); NLRB v. Dal-Tex Optical Co., 325 F.2d 78 (5th Cir. 1963); NLRB v. Porter County Farm Bureau Co-op. Ass'n, 314 F.2d 133, 143 (7th Cir. 1963).

6. In *Monroe*, the surveillance, held not a § 8(a) (1) violation, occurred on working time in the plant rather than on non-working time as in the present case. We find no inconsistency between our holding and *Monroe*.

■ Cooke noticed the bulletin on his shop door when reporting to work the morning of February 9. He took down the notice and put it in his pocket. Within a few moments, the "insubordinate" act was detected by Hagedorn whose office was in an adjoining building. The same day Hagedorn, his immediate supervisor Rothmeyer and personnel director Tillman decided that Cooke should receive a three-day suspension for this act. The record establishes that this punishment was in excess of that normally prescribed by the company for such an offense. The posted notice, obviously referring to Cooke, specified that he would be subject to the "same disciplinary action", not to greater penalties than others. The Board, in confirming the finding of the examiner, found that the punishment was meted out to Cooke not for removing the notice but for his presumptuous pro-union stand. The evidence, when viewed in the light of the employer's strong antiunion posture, supports that determination. See, for example, NLRB v. General Industries Electronics Co., 401 F.2d 297 (8th Cir., 1968); NLRB v. Byrds Mfg. Corp., 324 F.2d 329 (8th Cir. 1963); NLRB v. Twin Table & Furniture Co., 308 F.2d 686 (8th Cir. 1962); NLRB v. Solo Cup Co., 237 F.2d 521 (8th Cir. 1956); Note, Employer Motivation Under Section 8(a) (3) of the National Labor Relations Act, 43 Notre Dame Lawyer 202 (1967).

Hagedorn's participation is likewise found in the discharge of Oliver. Oliver had made pro-union statements to other employees and to supervisory personnel while in the company cafeteria and had also passed out union organizational cards to some employees. He was discharged on February 23, 1966, prior to his completion of a prescribed ninety-day "probationary period".[7] At a coffee break, Oliver urged a pro-union position on Zastrow, an assistant foreman who worked very closely with Hagedorn. Zastrow responded that the union would mean a "long, drawed-out" strike.

Around 4:00 o'clock that same afternoon, following the Oliver-Zastrow conference, Hagedorn came to Oliver and told him that he was fired for not "making enough" tents.

■ As is usual in this type of case, management asserts that Oliver's poor productivity and his probationary status establish that the discharge was for legitimate business reasons. The General Counsel urges that, but for Oliver's pro-union stand, he would not have been fired and that poor productivity is a mere excuse in an attempt to justify a discriminatory discharge. Zastrow, though probably not a supervisor under the Act, nevertheless maintained a close liaison with Hagedorn. He supervised, in Hagedorn's absence, employees who were subject to Hagedorn's control and he reported to Hagedorn. The timing of the discharge and the failure of Hawthorn to establish that Oliver was, in fact, deficient in production justifies the examiner's and the Board's findings that the reason given by the management for the discharge was pretextual and that the company's desire to discourage union activities was the basis for making Oliver another example of what the company could do to those who express a pro-union position. See, e. g., NLRB v. Joseph Antell, Inc., 358 F.2d 880 (1st Cir. 1966); NLRB v. Melrose Processing Co., 351 F. 2d 693 (8th Cir. 1965); NLRB v. Des Moines Foods, Inc., 296 F.2d 285, 287–288 (8th Cir. 1961); NLRB v. Solo Cup Co., 237 F.2d 521 (8th Cir. 1956).

Hagedorn also supplies a thread between the two respondent companies with respect to the unfair labor practice findings by the Board against New Haven. The notice of a union meeting that New Haven employee Meyer showed to Holliman and which in turn was viewed by Hagedorn and Hagedorn's supervisor had unpleasant repercussions for Meyer upon his return to his own plant. Meyer's foreman, apparently having been notified of the incident by telephone, told Meyer, "Walter, all you are

---

7. After ninety days, the employee is eligible for seniority rights on lay-offs and recall to work.

going to get out of this is a lot of trouble". Three days later, Robert Monzyk, president of New Haven, asked Meyer if he had sent in a "union card" and then informed him, "you know you are automatically fired when you send that [union] card in". A month later, Monzyk again approached Meyer and said, "I hear you are going to have a union meeting. You are going to spoil everything for us".

■ Monzyk's statement that New Haven would discharge Meyer if he were to send in a "union card" and his coercive interrogation of Meyer concerning the union formed the basis for the trial examiner and the Board to find that New Haven had violated § 8(a) (1) of the Act.[8] New Haven failed to except to the trial examiner's finding of an 8(a) (1) violation and, thus, such finding is conclusive, NLRB v. Rexall Chemical Co., 370 F.2d 363 (1st Cir. 1967); NLRB v. Ferraro's Bakery, Inc., 353 F.2d 366 (6th Cir. 1965); NLRB v. Mooney Aircraft, Inc., 310 F.2d 565 (5th Cir. 1962).

The final Meyer-Hagedorn skirmish was yet to come. Meyer in his employment as a New Haven truck driver often made deliveries to and picked up items at the Hawthorn plant. On February 18, 1966, while waiting to pick up Hawthorn materials, he went inside the plant to look for his son-in-law whom he found to be busy. On the way out of the plant, Hagedorn grabbed Meyer by the arm and told him to "Get the hell out of here". The record of what happened thereafter is not very clear except to indicate that during the altercation Meyer addressed Hagedorn in a most obscene manner.[9] The incident was reported through Hawthorn's channels of supervision and Hawthorn's plant manager Thomas Nolan notified New Haven's president of the incident and requested disciplinary action

but not the firing of Meyer. On his return to New Haven, Meyer was relieved from his duties as a driver and, two days later, was fired.

The trial examiner felt that the relevant facts, though creating suspicion that Meyer was fired to rid the company of a pro-union advocate, did not warrant a finding that Meyer's discharge was due to his union activities. The Board was of a contrary view and held that the firing of Meyer was violative of § 8(a) (3) and (1) of the Act.

The Board notes that Hawthorn requested "an apology" from Meyer but Monzyk took a more extreme measure. The Board concluded:

"In the light of these facts, and while we do not condone the obscene language used by Meyer, we conclude and find that Respondent New Haven's president seized upon this incident to carry out his threat to discharge Meyer if he became a union member * * * "

■■ Again, with the demonstrated anti-union animus of the employer, the Board is given the choice of reasonable alternative inferences and either choice has support in the evidence. Since the Board's determination is neither illogical nor arbitrary, it will not be disturbed. See, e. g., NLRB v. Neuhoff Bros., Packers, Inc., 375 F.2d 372 (5th Cir. 1967); NLRB v. Melrose Processing Co., supra; NLRB v. Thor Power Tool Co., 351 F.2d 584, 586–587 (7th Cir. 1965); NLRB v. Des Moines Foods, Inc., supra.

SPEECH–MOVIE ISSUES

On commencement of the organizational campaign, the union circulated a substantial amount of union literature.[10] The company responded with pro-management written material and, in addition, its foreman called small groups of

8. For a recent enforcement of a Board order based on the finding of a § 8(a) (1) violation of similar facts, see Macy's Missouri-Kansas Division v. NLRB, 389 F.2d 835 (8th Cir. 1968).

9. The record as a whole would infer that the argot of the plant was not otherwise always free of obscenity or profanity, a

not entirely unusual situation where men work and sweat together.

10. The trial examiner says:
"Its literature was of the usual kind, explaining the benefits assertedly flowing from concerted action and in union membership, advising employees not to heed belated promises of future benefits,

employees together and read a statement to them [11] which warned of trickery by union agents and carried the message that unionization means strikes, that unions have done nothing for Hawthorn workers and their families and that "this union can very well destroy the jobs of our employees".

The trial examiner ruled that the statement was not "itself violative of the Act". The Board refused to adopt the examiner's findings but opined that "the statement read by the supervisors to the employees, *considered in the context of the conduct hereinbefore found unlawful,* clearly conveyed the threat that selection of the union would endanger their jobs". (Emphasis added)

We are mindful that the test of whether the employer's statement is protected free speech under § 8(c) of the Act [12] or is a threat of reprisal is to be determined from the employees' viewpoint. Judge Gibson, speaking for our Court, said:

"[E]ven though the language is in terms of predictions, the employees could reasonably infer that the employer was willing to use its economic power to see that its dire predictions came true." NLRB v. Louisiana Mfg. Co., 374 F.2d 696, 703 (8th Cir. 1967).

A speech need not be viewed in a vacuum devoid of the circumstances in which it was uttered. Id. at 702.

It is conceded that the Hawthorn statement contains no express threat of reprisal. Indeed, our Court has held anti-union statements of similar import to be protected by § 8(c). See, e. g., NLRB v. Morris Novelty Co., 378 F.2d 1000, 1003–1004 (8th Cir. 1967); NLRB v. Herman Wilson Lumber Co., 355 F.2d 426 (8th Cir. 1966) [13]; and NLRB v. Superior Sales, Inc., 366 F.2d 229, 235–236 (8th Cir. 1966). The rec-

---

disparaging comments about unions, or threats of reprisal that might be circulated by employers."

11. The statement read in part:

"December 8, 1965
Memo: To All Employees—To Be Read By the Supervisors
I have called you together today to talk about a matter which vitally affects all of you. Please pay careful attention to what I am about to say because it will have an important effect on you, your job, your future relations with Hawthorn.

\* \* \* \* \*

The purpose of this meeting is to let you know exactly where Hawthorn stands on the union issue.

1. We do not want the union in our plant. This is the official position of your company.

\* \* \* \* \*

6. What the union is really saying is that if our employees sign these cards, they will call a strike to try to force their demands on the company and in the process they can cause our employees to lose their jobs. Therefore, in signing these cards could very well mean that our employees are putting themselves on the road to losing their jobs here, because the law gives us the right to hire replacements permanently if our people go out on an economic strike.

7. The union has not done anything for our people. The jobs here were provided by the company and not by any union. Hawthorn has taken care of its employees and their families in their time of need and no union has ever been around to give help to our employees. Yet this union can very well destroy the jobs of our employees and inflict suffering upon them and their families.

\* \* \* \* \*

The union people are here to make trouble and nothing else, and all for the purpose of collecting money for their own personal gain. If you let yourself be stopped on the street and if you allow the organizers to get into your home, you will encourage the union people in the belief that our employees are interested and if that happens, our employees will be pestered day after day by union representatives."

12. § 8(c), 29 U.S.C. § 158(c), provides: "The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit."

13. "If the Union calls an economic strike you place your job on the line. You can be permanently replaced. You can lose your job." 355 F.2d at 429.

ord indicates that the company statement was read to the employees during December of 1965. The commission of unfair labor practices by Hawthorn, including the Oliver and Cooke discharges, the unlawful surveillance at Stoney Hill Hall and at Hawthorn's cafeteria, all occurred after the reading of the statement. The Hawthorn statement did not directly threaten the employees with reprisal or the use of force. A finding that contemporaneous or prior employer unfair labor practices changed the impact of the statement into an implied threat of force or reprisal is neither justified nor sustained by the testimony or by the record as a whole. In the context of this case, the presentation of the statement to Hawthorn's employees is not shown to have been an unfair labor practice. NLRB v. Herman Wilson Lumber Co., supra; NLRB v. Howard Quarries, Inc., 362 F.2d 236, 240 (8th Cir. 1966); Fort Smith Broadcasting Co. v. NLRB, 341 F.2d 874 (8th Cir. 1965).

The Board and the trial examiner determined that the exhibition of the motion picture entitled "And Women Must Weep" to Hawthorn's assembled employees on January 25, 1966, was an unfair labor practice under § 8(a) (1) of the Act. Others have had occasion to characterize the film and we shall not do so independently in this opinion. The examiner described the color movie as "A frightening and fearful portrayal of human misconduct in a story, real or fancied, built about the events associated with a strike in a distant location ten years earlier". NLRB Chairman McCulloch said of the film:

"Few individuals are able to see behind the impression of authenticity that a skilled director may create by the use of characters, dialogue, and situation. A sophisticated person would probably recognize a film such as 'And Women Must Weep' for what it is, propaganda intended to create antiunion feeling, and will appropriately weigh or discount its one-sided and distorted message. But such films are not meant for sophisticated audiences. I have no doubt that among audiences of working men and women, as well as others, 'And Women Must Weep' is emotionally overpowering. It pictures a labor dispute as one in which Americanism, religion, family, motherhood, and innocent childhood are arrayed on one side, and goons, brutes, and murderers on the other or prounion side." *Carl T. Mason Co.*, 142 N.L.R.B. 480, 486.

Certain introductory material added to the film explaining that the portrayal was in support of "Right To Work Laws" was deleted in the presentation to Hawthorn employees. The film was introduced with an explanation by Hawthorn's vice president suggesting that the film depicted actual events portrayed by actors.[14] At the conclusion of the

14. The introduction included the following:
"Obviously, all of the facts and events surrounding the story of this strike could not have been filmed while they happened. Therefore, this film is acted by regular actors and actresses, but it is the real-life story of the strike as it happened. The story in this film was written by the wife of a minister who lived through this strike. She knew the strikers and the other employees at the company. She and her husband were caught up in the middle of this strike and its violence. I think it will be helpful for you to see this film and benefit from the experience of other people who got caught in a serious and sad chain of developments. In the film you will see how a few union agitators told the others what to do and how the union agitators took control of the situation. We don't want to see any union bosses telling you what to do or what not to do. I would particularly like to call your attention to the scene in the film where just a handful of rabid union members held a closed meeting and decided to call all the union members out on strike. You will notice that there was no general meeting of the membership and the question of whether or not to strike was not submitted to all of the people who would be affected by it. It is just this kind of action by a few agitators that we are against, and that is one of the main reasons why we do not want the union in here."

film, the company officer further commented:

> "What you have just seen is not an isolated case. Similar problems have happened in many other areas after a union has come in and caused troubles.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> I would hate to see anything like that happen in this area. That is why I urge each of you to tell these outside union salesmen to leave you alone— so there will be no chance for them to cause any troubles here."

▉▉▉▉ After seeing the motion picture, we are inclined to agree with the thoughts expressed by Professor Bok in The Regulation of Campaign Tactics in Representation Elections Under the National Labor Relations Act, 78 Harv.L. Rev. 38, 67 (1964): "Anyone who has endured the film 'And Women Must Weep' may justly regret that labor relation should call forth propaganda of this kind". Our judicial function does not permit a critical review of the quality and merit of the production, but only allows a determination of whether its showing in this case has unlawfully interfered with employees' rights guaranteed by § 7 of the Act. The showing of the film is protected by § 8(c) of the Act unless the message might expressly or impliedly contain a threat of company reprisal or force or a company promise of benefit to the employees with respect to the union organizational campaign.

The film portrayed the violent actions of union organizers and sympathizers. The hardship and suffering of employees and their families were depicted as resulting from an unjustified strike which union leadership forced upon the union members.

▉▉▉▉ Although § 8(c) does not protect threats of company force or reprisal it has not been construed to deny protection to forecasts of dire conse-quences caused by third parties. Predictions of disastrous events over which an employer has no control do not constitute unlawful statements. See, e. g., NLRB v. Morris Novelty Co., supra; NLRB v. TRW-Semiconductors, Inc., 385 F.2d 753 (9th Cir. 1967); Southwire Co. v. NLRB, 383 F.2d 235 (5th Cir. 1967); NLRB v. Herman Wilson Lumber Co., 355 F.2d 426 (8th Cir. 1966); Texas Industries, Inc. v. NLRB, 336 F.2d 128 (5th Cir. 1964).

"And Women Must Weep" conveys an express threat of union-made, not employer-induced, violence. Without evidence and an express finding by the Board, we cannot assume that Hawthorn employees interpreted the film as a threat of force or reprisal by Hawthorn against them if they should adopt the union.

In determining the instant screening to be unlawful, the examiner and the Board relied on Southwire Co., 159 N.L. R.B. 394, which held that an employer's showing of this film to new employees as part of an orientation program was an unfair labor practice.[15] However, the Board's holding in Southwire was overturned. Southwire Company v. NLRB, 383 F.2d 235 (5th Cir. 1967).

Judge Bell, speaking for the Fifth Circuit, noted:

> "The law has developed in this area to distinguish between a threat of action which the employer can impose or control and a prediction as to an event over which the employer has no control. The threat is not privileged but the prediction is. \* \* \* Respondent urges that the content of the film amounted to no more than a mere prediction since it had no control over what a union might do. We find, however, in the view we take of the case that it is unnecessary to reach this defense. We rest our decision instead on the absence of proof, based

---

15. In other decisions, the Board has set aside election results because, in the Board's opinion, the showing of "And Women Must Weep" improperly interfered with the employees' free expression of choice. Carl T. Mason, Co., 142 N.L.R.B. 480 (1963); Plochman & Harrison-Cherry Lane Foods, Inc., 140 N.L.R.B. 130 (1962).

on a consideration of the record as a whole, that the film constituted a threat of reprisal or force by Respondent against its employees." 383 F.2d at 241–242.

We note here, as the court did in Southwire, that neither the examiner nor the Board reached the question of whether there was a threat of company reprisal or force in the showing of the film. The record discloses that the union organizers responded to the film by the William Cooke leaflet, earlier referred to, and by a letter distributed by the union, dated February 11, 1966, which read in part:

"It is astounding that the Company had the guts to insult the intelligence of the workers the way they did. Maybe they think that because they don't pay you much, that you don't know anything.

\*　\*　\*　\*　\*　\*

THE TRUTH IS: The movie, 'And Women Must Weep' has already been declared illegal in other organizing campaigns.

\*　\*　\*　\*　\*　\*

At our next meeting in the near future, we will show our own movie about what happened in Princeton, Indiana. When you see what really happened, you will know for sure how 'phoney' Hawthorne really is."

Indeed, organized labor's answer to "And Women Must Weep" is another film entitled "Anatomy of a Lie" which in this case was shown at a union meeting for Hawthorn employees.

 The foregoing suggests that the debate between union and management was "uninhibited, robust, and wide-open" and included "vehement, caustic, and sometimes unpleasantly sharp attacks", not an unfamiliar phenomenon in labor-management controversies. See Linn v. United Plant Guard Workers, 383 U.S. 53, 62, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966); NLRB v. Morris Novelty Co., 378 F.2d 1000, n. 6 (8th Cir. 1967). We cannot assume that Hawthorn's employees were unable to discern emotional, anti-union propaganda from sober fact to the extent that they could not intelligently assess the worth of "And Women Must Weep".[16] With the present record, we cannot affirm the finding that Hawthorn's showing of "And Women Must Weep" was an unfair labor practice.

In accordance with this opinion, we grant enforcement of the Board's order as to New Haven. The Board's order as to Hawthorn is enforced except that reference to "And Women Must Weep" shall be deleted therefrom.[17]

---

16. Psychological studies may suggest that emotionally-charged fear-arousing propaganda has little lasting effect and its overall result is less than that of more sober presentations. Janis & Feshbach, "Effects of Fear Arousing Communications", J. Abnormal & Soc. Psych. 78, at 87, 92 (1953).

17. The Board's order makes no explicit reference to Hawthorn's statement dated December 8, 1965, which was read to Hawthorn employees. Accordingly, we consider it unnecessary to alter or otherwise amend the Board's order.