434 F.2d 1069
 75 L.R.R.M. (BNA) 2814, 64 Lab.Cas. P 11,301
 KELLWOOD COMPANY, OTTENHEIMER DIVISION, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent, and
International Ladies' Garment Workers' Union, Intervenor.
INTERNATIONAL LADIES' GARMENT WORKERS' UNION, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
 Nos. 19858, 19982.
 United States Court of Appeals, Eighth Circuit.
 Nov. 25, 1970,
Rehearing En Banc and Rehearing Denied Dec. 28, 1970.
 
 Andrew C. Partee, Jr., New Orleans, La., for petitioner.
 Eugene B. Granof, Atty., N.L.R.B., Washington, D.C., for respondent.
 Hames E. Youngdahl, Little Rock, Ark., for intervenor.
 Before GIBSON and LAY, Circuit Judges, and HUNTER, District Judge.
 LAY, Circuit Judge.
 
 
 1
 Kellwood Company, Ottenheimer Division, petitions to set aside a decision and order of the National Labor Relations Board issued against it for violations of the National Labor Relations Act. 29 U.S.C.A. 158(a)(1), (3), (5). The Board has cross-petitioned for enforcement of its decision and order reported at 178 N.L.R.B. No. 8. The alleged unfair practices arise from the company's relationship with the International Ladies' Garment Workers' Union, AFL-CIO, relating to the company's operation of its three plants producing garments in Little Rock, Arkansas. In consolidated case No. 19,982, the union petitions for expansion of the remedial order relating to backpay. The primary appeal, No. 19,858, involved four separate charges filed by the union. The examiner has filed a 130 page report; the Board adopted the findings, conclusions and recommendations of the examiner with minor modification.
 
 
 2
 Upon a thorough canvassing of the record as a whole, we find substantial evidence and with one modification direct the Board's order to be enforced.
 
 
 3
 A brief history of events will suffice here. Kellwood operates approximately 36 separate plants throughout the United States, selling the major portion of its products to Sears, Roebuck & Company. The Ottenheimer Division consists of three plants in Little Rock, Arkansas, employing approximately 1,250 persons; its plant in Lonoke, Arkansas, is not involved in this litigation. The union has made several abortive attempts to organize Kellwood plants, but has never succeeded prior to the representation election on January 12, 1966, at the Little Rock plant.[1] On that date, after a strong anti-union campaign, the union was elected, 666-564, to become the collective bargaining representative. Thereafter, the union and company representatives negotiated without success from March 23, 1966, to October 24, 1966. During this period the parties held 30 meetings, some considered formal, others informal bargaining sessions. On October 25, the employees began a strike which continued until November 22, 1967. On December 5, 1967, the company, having replaced the majority of strikers with nonunion employees, declared that it no longer recognized the union.
 
 
 4
 The unfair practice charges may be generally summarized: (1) the failure to bargain in good faith from March 23, 1966; (2) the unilateral wage increases on October 25, 1966, and February 1, 1967; (3) the refusal to give the union relevant information for bargaining in December 1966; (4) the refusal to reinstate all strikers; (5) bargaining directly with strikers both during and after the strike; (6) pre-election conduct in violation of 8(a)(1) including the showing to employees of the film 'And Women Must Weep.' Little purpose would be served in setting forth the factual detail of the events in question. These are fully and fairly set forth in the examiner's opinion as adopted by the Board in 178 N.L.R.B. No. 8. Upon review of the entire record it is our decision to enforce the Board's order with only one modification.
 
 
 5
 We do not find in the company's pre-election use of the film 'And Women Must Weep' any transgression of 8(a)(1). The Board urges that our holding on this issue in NLRB v. Hawthorn Co., 404 F.2d 1205 (8 Cir. 1969), that prediction of dire consequences beyond the control of the company is not a 8(a)(1) violation, is now rejected by NLRB v. Gissel Packing Co., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). The Board relies upon NLRB v. C. J. Pearson Co., 420 F.2d 695 (1 Cir. 1969).[2] Assuming arguendo this to be true and applying the 'objective evidence' test of Gissel to our analysis in Hawthorn, we find there is no prediction of violence or company reprisal in the introduction to, or the use of, the film. The statement made by the company president concerns the company not wanting 'union bosses telling you what to do or what not to do.' Our analysis of the film as observed in Hawthorn remains the same. It is nothing more than 'emotional, anti-union propaganda' and it is difficult to believe that anyone could not 'intelligently assess (its) worth.' NLRB v. Hawthorn Co., 404 F.2d 1205, 1215 (8 Cir. 1969). Under the circumstances, we find no violation under 8(a)(1) in its use in the present campaign.
 
 
 6
 The basic issue surrounds the 8(a)(5) violation as it relates to the company's good faith in bargaining. The company insists that it was at all times engaged in good faith bargaining as evidenced by its September 29, 1966, 'acceptance' of the union's wage proposal. As thereafter immediately determined, there was no meeting of the minds as to the intended terms of agreement. The examiner, found the 'acceptance' 'was a bad-faith misunderstanding, contrived and thereafter used as a device to foul up and obstruct the bargaining process.' The examiner's conclusion is challenged. Assuming, solely for the sake of argument, there existed a good faith misunderstanding in the 'acceptance' of the company, there are too many other factors which weigh against the company's contention of good faith bargaining.
 
 
 7
 There exists no dispute that the company's top offer, predetermined by it in May 1966, was not made until October 6, 1966, 18 days before the strike, and that in fact a bargaining agreement was never reached in the period from May 1966 to November 1967. On December 5, 1967, the company officially declared that it no longer recognized the union as the bargaining representative of the employees. The company urges that its refusal to reach an agreement does not justify a finding of bad faith since it had every right to remain firm and not concede to the union's demands. As an isolated proposition we agree since 8(d) expressly so provides. However, an employer who remains adamant in his offer must subject his firm bargaining position to an appraisal of his good faith intent as manifested by his overall conduct evidencing sincerity to work for an agreement and industrial peace.[3] NLRB v. Arkansas Rice Growers Cooperative Ass'n, 400 F.2d 565, 571-572 (8 Cir. 1968); NLRB v. Patent Trader, Inc., 415 F.2d 190, 197-198 (2 Cir. 1969); Flambeau Plastics Corp. v. NLRB, 401 F.2d 128, 135 (7 Cir. 1968), cert. denied 393 U.S. 1019, 89 S.Ct. 625, 21 L.Ed.2d 563 (1969); NLRB v. Reed & Prince Mfg. Co., 205 F.2d 131, 134-135 (1 Cir. 1953), cert. denied 346 U.S. 887, 74 S.Ct. 139, 98 L.Ed. 391. See also Sign & Pictorial Union Local 1175 v. NLRB, 419 F.2d 726, 738 (D.C.Cir. 1969); Caroline Farms Div. of Textron, Inc. v. NLRB, 401 F.2d 205, 211 (4 Cir. 1968). The Board found that the company various means to embarrass and undermine the union in the eyes of its employees. The examiner concluded and the Board agreed that the company's purpose was to make clear to its employees that the union was ineffective in its role as a representative, that the union could not bring about an agreement and that the company would protect and treat the employees better without the union. Evidence which the Board considered included the announcement of an immediate ten cent raise in Ottenheimer's Lonoke, Arkansas, plant made during the course of negotiations. Prior to this time the most the company had ever offered the union was a five cent raise. Cf. NLRB v. Katz, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962). The announcement at Lonoke was simultaneous to the first communication of the same offer to the union. As the company publicly proclaimed, the increase was decided upon, in part, to convince the employees that they did not need a union. In its announcement the company said:
 
 
 8
 'You did not have to pay one cent in union dues to get this increase. It was not necessary for you to call on any union outsiders to speak in your behalf in order to get this raise. 'Our Company has always followed the policy of improving wages and working conditions whenever it was able to do so and it will continue to follow that policy in the future. No union can force us to do more than that. This increase should be proof that a union is not needed by a company like ours that treats its employees fairly and rewards them for their good work.'
 
 
 9
 Among other evidence the Board considered was the company's letter of October 24, 1966, to the Little Rock employees which the Board found helped precipitate the strike vote. In this letter the Board found that the company misrepresented that, 'At 11:00 a.m. this morning, the union said it had no offer on the table.' The letter also read: 'I hope you will not continue to be misled by a union, which as I see it, is using you to further its interests throughout all of Kellwood rather than to protect your interests here at Little Rock.' Cf. NLRB v. Fitzgerald Mills Corp., 313 F.2d 260 (2 Cir. 1963), cert. denied 375 U.S. 834, 84 S.Ct. 47, 11 L.Ed.2d 64. The company then stated that it was putting into effect a ten-cent-an-hour increase immediately. This raised the minimum wage paid by Kellwood to $1.35. The company and the union were both aware that on September 23, 1966, the Fair Labor Standards Act was signed by the President raising the minimum wages to $1.40 on February 1, 1967, and $1.60 on February 1, 1968.
 
 
 10
 The record is replete with substantial evidence of other acts to denigrate the union in the eyes of its members. The evidence is undisputed that the company in its pre-election campaign and in its later bulletins and speeches emphasized that they could not be forced to agree with the union and that they later boasted they were successful in keeping their promises.[4] We have little difficulty with this record in holding that there exists sufficient evidence to sustain the Board's finding of 8(a)(5) bad faith. The law is well settled that an employer's communications may be used to evaluate his subjective mood at the bargaining table. See NLRB v. General Electric Co.,418 F.2d 736 (2 Cir. 1969). The negotiations themselves lend support to the inferences taken by the examiner. The company's early shadow bargaining, evidenced by offers which gave no more than the anticipated federal minimum wage increases, cannot be ignored; the unilateral wage increases immediately before and during the strike, their earlier misrepresentation that they would have to confer with Kellwood's Executive Committee before negotiating further, the company's ploy in rehashing old misunderstandings in post-strike meetings, the company's denial of relevant information as requested by the union in bargaining,[5] all are among the many, many incidents considered by the Board supporting an 8(a)(5) violation.
 
 
 11
 As Judge Kaufman observed in the General Electric case:
 
 
 12
 'The difficulty here, however, arises out of the herculean task of legislating a state of mind. Congress has ordered the Board-- and this court-- to effectuate its policy of encouraging good faith bargaining, and not to avoid it because the mandate is difficult to apply. The Board has done just that. And, on the basis of substantial evidence we agree. A pattern of conduct by which one party makes it virtually impossible for him to respond to the other-- knowing that he is doing so deliberately-- should be condemned by the same rationale that prohibits 'going through the motions' with a 'predetermined resolve not to budge from an initial position." 418 F.2d at 762.
 
 
 13
 The question of good faith bargaining is for the Board's expertise more than ours. We satisfy ourselves that there exists substantial evidence, if credibly believed by the examiner and the Board, to support their conclusion. NLRB v. Arkansas Rice Growers Cooperative Ass'n, 400 F.2d 565, 572 (8 Cir. 1968). We find it here. We have no difficulty on this record in resolving that there have been violations of 8(a)(1), (3) and (5), more fully described by the Board, and that the Board's order should be enforced as herein modified.
 
 
 14
 We further agree that the evidence clearly demonstrates that the strike was precipitated by the company's unfair bargaining tactics in its direct publicity to the employees as an effort to undermine the effectiveness of the union. Cf. NLRB v. General Electric Co., supra. The breaking point came when the company accused the union of 'forcing the impasse'[6] and put into immediate effect the ten cent raise on October 25. It is difficult in judicial hindsight to avoid any conclusion other than the one reached by the Board. There existed obvious strategy to force a 'collision course' and obstruct bargaining. The company succeeded in what it set out to do.
 
 
 15
 The Board ordered the customary remedy for unfair-labor-practice strikers by requiring full and immediate reinstatement of all employees to their former or equivalent positions commencing five days after the union's unconditional request for reinstatement on November 22, 1967. The union attacks this relief as an abuse of discretion, requesting instead backpay from the date of the strike. We think the remedy is appropriately within the broad discretion of the Board. NLRB v. J. H. Rutter-Rex Mfg. Co., 396 U.S. 258, 90 S.Ct. 417, 24 L.Ed.2d 405 (1969); NLRB v. Gissel Packing Co., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969).
 
 
 16
 The Board's order is to be enforced as modified.
 
 
 
 [1]
 For prior episodes of the union's long struggle for recognition see Kellwood Co., Ottenheimer Bros. Mfg. Div. v. NLRB, 411 F.2d 493 (8 Cir. 1969); NLRB v. Hawthorn Co., 404 F.2d 1205 (8 Cir. 1969); Southern Foundation v. NLRB, 406 F.2d 1063 (6 Cir. 1969) (no violation found); see also, Kellwood Co. v. NLRB, 427 F.2d 1170 (9 Cir. 1970)
 
 
 [2]
 The First Circuit there observed:
 'We read the opinion in NLRB v. Gissell Packing Co., 1969, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547, as indicating two ways in which an employer's predictions as to possible unhappy consequences of unionization might transgress. The prediction might indicate that unnecessary consequences would be deliberately inflicted by the employer, in other words, a threat of retaliation. Alternatively, consequences not within the control of the employer might be described as probable or likely, when in fact there was no objective evidence of any such likelihood. This would not be a retaliatory threat, but it would be an improper threat nonetheless. See 395 U.S. 575 at 618, 89 S.Ct. 1918.' 420 F.2d at 695.
 
 
 [3]
 As Mr. Justice Frankfurter observed in NLRB v. Truitt Mfg. Co., 351 U.S. 149, 155, 76 S.Ct. 753, 757, 100 L.Ed. 1027 (1956) (separate opinion):
 'A determination of good faith or of want of good faith normally can rest only on an inference based upon more or less persuasive manifestations of another's state of mind. The previous relations of the parties, antecedent events explaining behavior at the bargaining table, and the course of negotiations constitute the raw facts for reaching such a determination. The appropriate inferences to be drawn from what is often confused and tangled testimony about all this makes a finding of absence of good faith one for the judgment of the Labor Board, unless the record as a whole leaves such judgment without reasonable foundation. See Universal Camera Corp. v. (National) Labor (Relations) Board, 340 U.S. 474 (71 S.Ct. 456, 95 L.Ed. 456).'
 
 
 [4]
 In December 1965, the president of the company said:
 'Ask the union what happens to employees when they vote for the union in an election and then the company and the union never reach an agreement and never sign a contract.'
 
 
 [5]
 On November 30, 1966, the company notified the union that future negotiations would have to afford seniority protection for employees hired to replace strikers. On December 13, the union requested a list of present employees, their job classifications, and rates of pay. The company responded that it felt such information was irrelevant. Approximately two months later when the General Counsel issued a complaint based upon the company's refusal, the company supplied data concerning wages and job classification. However, the information given lacked the employees' names and addresses. The Board held that the names of the employees were requested in good faith and that the information was relevant to continuing negotiations. The examiner found that the company's claim at the hearing that it feared reprisals against the replacement workers was belatedly made and was not asserted at the time of refusal. Under the circumstances presented we find substantial evidence to support the Board's finding. The names of the employees as related to their jobs and wages were essential to good faith negotiations. Cf. Boston Herald-Traveler Corp. v. NLRB, 223 F.2d 58 (1 Cir. 1955); NLRB v. Whitin Machine Works, 217 F.2d 593 (4 Cir. 1954), cert. denied 349 U.S. 905, 75 S.Ct. 583, 99 L.Ed. 1242 (1955). The test for determining the general obligation of an employer to produce information is one of relevancy as it relates to the union's proper performance in its role as bargaining representative of the employees. NLRB v. Acme Indus. Co., 385 U.S. 432, 87 S.Ct. 565, 17 L.Ed.2d 495 (1967); NLRB v. Arkansas Rice Growers Cooperative Ass'n, supra. Here the company injected into the negotiations the issue of seniority and wages concerning the new employees. The company was in a weak posture to deny access of this information to the union
 
 
 [6]
 Apposite here is the language in Industrial Union of Marine & Shipbuilding Wkrs. v. NLRB, 320 F.2d 615, 621 (3 Cir. 1963):
 'It is manifest that there can be no legally cognizable impasse, i.e., a deadlock in negotiations which justifies unilateral action, if a cause of the deadlock is the failure of one of the parties to bargain in good faith.'
 Furthermore, the company is somewhat hard put to factually assert that an 'impasse' existed at the time of the October 25, 1966, unilateral wage increase. Immediately before the strike on October 24, 1966, the evidence was that Mr. Kullman, representing the company, asked the union for a counterproposal to its last offer. Although the union at that time was effectively undermined by the company's open letter to the employees and would have been publicly embarrassed to again make a lower offer, nevertheless, in the position assumed by the company, negotiations were still open for the union to do so.